GEORGE KITCHING et al., Appellants, *v.* KATE E. BROWN, Respondent.

1. EVIDENCE — TESTIMONY AS TO EXISTING CONDITIONS WHEN ADMISSIBLE TO AID IN ASCERTAINING MEANING OF WORDS. The phrase "tenement house" having no well-defined legal meaning, the testimony of witnesses, familiar with the conditions existing at the time of its use in a restrictive covenant, is admissible in order to aid the court in determining whether or not it embraces what is known as an "apartment house."

2. WHEN COVENANT RESTRICTING ERECTION OF TENEMENT HOUSE DOES NOT RESTRICT ERECTION OF AN APARTMENT HOUSE. A covenant executed in 1873 prohibiting the use of property for purposes supposed to be dangerous, noxious or offensive and, among other things, restricting the erection of a "tenement house," does not restrict the construction of a modern apartment house upon the property in 1902, and an action will not lie to restrain its erection.

3. EXTRA ALLOWANCE. Although such an action may be difficult and extraordinary, an extra allowance of costs to the successful defendant is erroneous, where no sum is recovered or claimed and there is no allegation, proof or finding as to the value of the subject-matter involved. (Code Civ. Pro. § 3253.)

*Kitching* v. *Brown*, 92 App. Div. 160, modified.

(Argued January 18, 1905; decided February 21, 1905.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered April

12, 1904, affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court on trial at Special Term.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Henry W. Hardon* and *John Frankenheimer* for appellants. The defendant's houses are tenement houses as defined by the legislature, the courts and the lexicographers. (*Musgrave* v. *Sherwood*, 53 How. Pr. 311; *Levy* v. *Schreyer*, 27 App. Div. 282; *Sonn* v. *Heilberg*, 38 App. Div. 515; *Ammerman* v. *Deane*, 132 N. Y. 355; *Boyd* v. *Kirwin*, 15 N. Y. Supp. 721; *White* v. *Collins, etc., Co.*, 82 App. Div. 1.) It was error to receive opinion evidence upon the question of the meaning of the term "tenement house." (*Stevens* v. *Ely*, 162 N. Y. 79; *Matter of Eysamen*, 113 N. Y. 62; *Dilleber* v. *Home Life Ins. Co.*, 69 N. Y. 256; *Church* v. *Howard*, 79 N. Y. 415.) The evidence affords no basis for the supposed distinction between tenement house and apartment house. (*Levy* v. *Schreyer*, 27 App. Div. 282; *Musgrave* v. *Sherwood*, 53 How. Pr. 311, 23 Hun, 674.) If the term "tenement house" has both a primary and secondary meaning it must be construed in its primary meaning. (*Musgrave* v. *Sherwood*, 53 How. Pr. 315; *Mallin* v. *May*, 13 M. & W. 511; *Sleight* v. *Rhinelander*, 1 Johns. 192; 2 Johns. 531; Metcalf on Cont. 318, 321.) If doubt still remains as to the meaning of the term "tenement house" in the defendant's covenant the term must be construed most strongly against the defendant. (*Edsall* v. *Camden Co.*, 50 N. Y. 661; *Paul* v. *T. Ins. Co.*, 112 N. Y. 472; *Martin* v. *Stone*, 2 Cow. 781; *Hoffman* v. *Ins. Co.*, 32 N. Y. 405; *Gifford* v. *Church*, 56 Barb. 114; *Rocker* v. *Ins. Co.*, 4 App. Div. 76.) The extra allowance of $750 is without warrant of law. (*S. T. Co.* v. *R. R. Co.*, 178 N. Y. 407; Code Civ. Pro. § 3253; *Johnson* v. *Shelter Island*, 122 N. Y. 330; *O., etc., R. R. Co.* v. *V., etc., R. R. Co.*, 63 N. Y. 176; *Conaughty* v. *Bank*, 94 N. Y. 401; *Hanover* v. *Germania Co.*, 138 N. Y. 252;

*People* v. *Ferry Co.*, 68 N. Y. 71; *Rothery* v. *N. Y. R. Co.*, 24 Hun, 172; 90 N. Y. 30; *Musgrave* v. *Sherwood*, 29 Hun, 475.)

*James L. Bishop, Francis M. Jencks* and *Harold Swain* for respondent. There was no error in receiving evidence as to the difference in fact between buildings known as "tenement houses" in 1873 and those subsequently known as "apartment houses." (*Sleight* v. *Hartshorne*, 2 Johns. 531; *Collender* v. *Dinsmore*, 55 N. Y. 200; *Nelson* v. *S. M. Ins. Co.*, 71 N. Y. 453; *Smith* v. *Clews*, 114 N. Y. 190; *Atkinson* v. *Truesdale*, 127 N. Y. 230; *Underwood* v. *G. Ins. Co.*, 161 N. Y. 413; Jones on Const. of Cont. § 64; Elphinstone on Interp. of Deeds, 48; *Shore* v. *Wilson*, 9 Cl. & F. 355; *Clayton* v. *Gregson*, 4 N. & M. 602.) The definition of the words "tenement house" in the act of 1867 does not control the construction of the words as used in the covenant. (*Boyd* v. *Kerwin*, 15 N. Y. Supp. 721; *White* v. *C. B. & Co.*, 82 App. Div. 1.) A restrictive covenant relative to the use of property is to be construed most strictly against those seeking to enforce it. (*Duryea* v. *Mayor, etc.*, 62 N. Y. 592; *Blackman* v. *Stryker*, 142 N. Y. 55; *Grafton* v. *Moir*, 130 N. Y. 465; *Clarke* v. *Jammes*, 87 Hun, 215; *Gubbins* v. *Peterson*, 21 App. Div. 241; *Hurley* v. *Brown*, 44 App. Div. 480, 483; 54 App. Div. 619; *Sonn* v. *Heilberg*, 38 App. Div. 515; *White* v. *Collins*, 82 App. Div. 101; *Herrman* v. *M. Ins. Co.*, 81 N. Y. 184; *Janneck* v. *M. L. Ins. Co.*, 162 N. Y. 574; *L. A. Corp.* v. *Thompson*, 170 N. Y. 103.) The words should be construed with regard to the general character and purpose of the covenant. (*Paul* v. *T. Ins. Co.*, 112 N. Y. 472; Jones on Const. of Cont. § 220; Elphinstone on Interp. of Deeds; *Musgrave* v. *Sherwood*, 54 How. Pr. 338.) The buildings erected by the defendant are not tenement houses, as that term is used in the covenant. (L. 1892, ch. 275, § 16; *Musgrave* v. *Sherwood*, 54 How. Pr. 338; *Boyd* v. *Kerwin*, 17 N. Y. Supp. 721; *White* v. *C. B. & C. Co.*, 82 App. Div. 1; *McClure* v. *Leaycraft*, 97 App. Div. 518.) The meaning of

the term "tenement house" is a question of fact.   (*Pitney* v.
*G. F. Ins. Co.*, 56 N. Y. 6; *Hoyt* v. *Hoyt*, 73 N. Y. 505;
*Camp* v. *Treanor*, 143 N. Y. 649; *Kenyon* v. *K. T. & M.
T. A.*, 122 N. Y. 254; *Stokes* v. *Mackay*, 140 N. Y. 640;
*Smith* v. *Clews*, 114 N. Y. 190; *People ex rel.* v. *D. & H.
C. Co.*, 177 N. Y. 237; *Nat. Bank of Deposit* v. *Rogers*, 166
N. Y. 380; *Townsend* v. *Bell*, 167 N. Y. 462.)   The allow-
ance granted to defendant should not be disturbed here.   In
any event it was proper.   (*S. T. Co.* v. *N. Y. C. & H. R. R.
R. Co.*, 178 N. Y. 407; *Allan* v. *Stevens*, 161 N. Y. 122;
*Woodbridge* v. *F. Nat. Bank*, 166 N. Y. 238; Code Civ.
Pro. § 3253, subd. 2; *Lattimer* v. *Livermore*, 72 N. Y. 174.)

WERNER, J.   This is a suit in equity, to restrain the breach
of a covenant forbidding the erection of a tenement house by
the defendant upon her premises in West 71st street, in the
borough of Manhattan, city of New York.   The premises of
the defendant are on the southerly side of the extreme west-
erly end of 71st street, having a street frontage of 153 feet,
being flanked on the west by the tracks of the New York
Central railroad, and on the east by the adjoining and con-
tiguous premises of the respective plaintiffs.   All the parties
derive their titles through Jacob Harsen, deceased, by con-
veyances from his executors in 1873, which contained the fol-
lowing covenant:

"And the said party of the second part, for himself, his
heirs and assigns, doth hereby covenant to and with the said
parties of the first part, their successors and assigns, and with
the owners for the time being of the adjacent lots, jointly and
severally, that neither the said party of the second part, nor
his heirs nor assigns, shall or will, at any time hereafter erect
any buildings within forty feet of the front of said premises,
except of brick or stone, with roofs of slate or metal, and will
not erect or permit upon any part of said premises any stable
of any kind, coal yard, slaughter house, meat shop, tallow
chandlery, steam engine, smith shop, forge, furnace, brass
foundry, nail or other iron foundry, or any manufacturing of

glass, gunpowder, starch, glue, varnish, vitriol, ink, petroleum or turpentine, or any cooper's, carpenter's or cabinetmaker's shop, or any establishment for tanning, dressing, preparing or keeping skins, hides or leather, or any brewery, distillery, sugar refinery or bakery, or drinking or lager beer establishment, circus, menagerie or public show or exhibition of animals, railroad depot, railroad stable, car, engine or tenement house, or any other trade, manufactory, business or calling which may be in any way dangerous, noxious or offensive to the neighboring inhabitants, and that no building shall be erected upon said lands, or any of them, which shall contain any alley or entrance running through them for ingress or egress to rear buildings. And it is declared that this covenant is a lien and runs with said lands, and binds all persons seized thereof for the time being."

In 1900 the defendant erected upon her premises three apartment houses, seven stories in height, each floor having two apartments that rent from $1,200 to $1,400 a year. The total cost of the buildings was about $400,000, and their equipment was modern, elegant and complete. The several apartments each consisted of eight or nine rooms, including a private hall, parlor, library, dining room, butler's pantry, kitchen, five bedrooms, servants' room, private bathroom with shower bath and closet, servants' bathroom and closet. The rooms are finished in natural woods, highly polished, and the walls are handsomely frescoed, tinted or papered. The buildings are heated by steam or hot water, lighted by electricity, provided with hot and cold water conveyed in open work plumbing, with gas ranges for cooking, electric elevators and, in short, equipped with every modern improvement designed to promote convenience, comfort and sanitation. The adjoining and contiguous premises of the respective plaintiffs are occupied by buildings designed and adapted exclusively for use as private dwelling houses. It is conceded that before these apartment houses were erected the plaintiffs and others notified the defendant of their protest, and of their intention to commence suit if the work should be undertaken,

and the date of the commencement of the suit is conclusive evidence of the promptness with which the plaintiffs proceeded to protect and enforce their rights. We have, therefore, a case unembarrassed by such extraneous or incidental considerations as laches or waiver, and the single question fairly presented is whether the covenant above quoted covers the kind of structure which the defendant has erected upon her premises.

At the threshold of the case there is a question relating to the admission of evidence, which should be first decided, for if we should hold that the trial court committed error in this regard, there would be no occasion to consider the merits. The defendant called as witnesses a number of persons having special information and knowledge of the building trade and conditions in 1873, when the covenant was made, and of the changes and developments which have taken place since then. The substance of their testimony was that in 1873 there was no such building as the modern apartment house, which was not a development of the "tenement house" of that period, but a radical departure therefrom, suggested by new conditions much later in point of time; and that the term "tenement house" as then generally known and understood had reference to community houses occupied by persons of small means, the distinguishing characteristics of which were the common use of hallways, water closets, water and yard privileges, by a population crowded into insufficient space and deprived of many of the essentials to privacy, decency and health. The book definitions, to which we shall hereafter refer, when contrasted with the general and popular understanding and use of the term "tenement house," clearly show that its meaning, as used in a particular covenant at a specified time, cannot be judicially ascertained, without taking judicial cognizance of contemporary conditions, or resorting to competent evidence for that purpose. When a word or phrase used in a covenant has more than one meaning, judicial knowledge of existing circumstances and conditions is indispensable to a correct exposition of the law upon the subject, and to that

end parol evidence is admissible. (*Reynolds* v. *Commerce Fire Ins. Co.*, 47 N. Y. 597–605; *Collender* v. *Dinsmore*, 55 id. 200.) One of the familiar rules applicable to the interpretation of ambiguous covenants and agreements is to ascertain, as nearly as may be, the situation of the parties, their surroundings and circumstances, the occasion and apparent object of their stipulations, and from all these sources to gather the meaning and intent of their language. (*Smith* v. *Kerr*, 108 N. Y. 31–37; *Springsteen* v. *Samson*, 32 id. 703; *Evansville Nat. Bk.* v. *Kaufmann*, 93 id. 273–281; *Merriam* v. *U. S.*, 107 U. S. 437.) As will more clearly appear in the further development of the discussion, it was necessary for the trial court to know something of the housing conditions which prevailed in New York city in 1873, when the covenant herein was made, and that information it had the right to obtain from witnesses competent to speak upon the subject. For these reasons we think there was no error in the admission of the so-called expert testimony, and we proceed to consider the case upon the merits.

Thus far the courts have upheld the defendant in the contention that the covenant under scrutiny does not inhibit the building and maintenance of the structure which she has erected upon her premises. From the inception of this litigation to the present time the plaintiffs have insisted that tenement houses and apartment houses differ simply in degree, but not in kind, and that in contemplation of law they are one and the same. To support their respective contentions both parties refer to the covenant and to three classes of definitions, which may be differentiated as (1) legislative, (2) lexicographic, (3) judicial. We shall briefly discuss the first two before taking up the covenant and the authorities.

In 1867 the legislature passed an act (Chap. 908) for the regulation of tenement and lodging houses in the cities of New York and Brooklyn, in which (Sec. 17) a tenement house within the meaning of the act " shall be taken to mean and include every house, building, or portion thereof which is rented, leased, let or hired out to be occupied, or is occupied

as the home or residence of more than three families living independently of another, and doing their cooking upon the premises, or by more than two families upon a floor, so living and cooking, but having a common right in the halls, stairways, yards, water closets or privies, or some of them." This is the legislative definition relied upon by the plaintiffs. The most cursory perusal of its context discloses that it relates not merely to a different class, but a different kind, of buildings than those erected by the defendant, and that the definition was coined for a limited and specified purpose. The act, which consists of 19 sections, deals with the evils peculiar to the lowest grade of tenement houses as they existed in 1867, and was designed to compel the observance of the most primary and simple rules of ventilation, disinfection, sanitation and safety. Halls and bedrooms were to be ventilated; roofs kept in repair; stairs provided with railings or bannisters; there was to be at least one water closet for every twenty persons, properly equipped with traps and connected with sewers; cesspools were to be allowed only when unavoidable; cellars were not to be occupied as dwellings without permission from the authorities; every tenement was to be kept clean and to be whitewashed at least twice a year; sick persons were to be reported to the board of health, and, in case of contagious disease, the premises were to be fumigated; the specifications as to height of rooms, size of windows, character of cellar floors, and numerous other details, very clearly disclose the purpose of the legislation and the kind of buildings to be affected by it. While it is obvious, therefore, that this statutory definition, in and of itself, throws no light upon the question before us, the history which underlies the statute is both interesting and instructive as bearing upon the common understanding of the term "tenement house" at the time when the covenant before us was made.

As early as 1834 there was a philanthropic movement for tenement house reform, as one of the means of improving the conditions of the poor in the city of New York. In the report for 1853 of the association formed for that purpose

attention was called to the fact that, owing to the peculiar
geography of the city, it was difficult to provide adequate and
proper dwelling places for the poor; that a great tide of imi-
gration had swept into the lower wards of the city, crowding
the tenements far beyond the limits of safety and health,
inhabiting "crazy old buildings in filthy yards, damp, dark
basements, leaky garrets, shops, outhouses and stables, con-
verted into dwellings that are scarcely fit to shelter brutes
* * *" and "almost invariably surrounded with disgusting
filth, evolving poisonous gases, and with various other local
unhealthy influences which are scarcely less injurious to the
inmates than is their pent-up indoor life." Much more might
be quoted from the literature of that time upon the subject
to show that in 1873, when the statute of 1867 was in force,
the term "tenement house" had acquired a fixed and definite
popular meaning. This meaning has been strengthened rather
than weakened by the lapse of time, and by subsequent legis-
lative enactment due to progress and change in the art of liv-
ing in a great city like New York. We find the first legisla-
tive recognition of the distinction between tenement houses
and apartment houses in the statute creating a department of
buildings for New York city (L. 1892, chap. 275) and this
was followed by the local building code in the charter of 1899,
which provides that "An apartment house shall be taken to
mean and include every building which shall be intended or
designed for, or used as the home or residence of three or
more families or households, living independently of each
other, and in which every such family or household shall have
provided for it a kitchen, set bath tub and water closet, sepa-
rate and apart from any other." These legislative definitions,
it may be urged, emphasize differences in degree only, and to
this the obvious answer is, that every grade of living, from
the hovel to the palace, when properly analyzed, simply marks
a difference in degree. So much for the legislative definitions.

Turning now to the lexicographic definitions we find that
the terms "tenement houses" and "apartment houses" are
coined rather than derived. A tenement is "a dwelling

inhabited by a tenant; a dwelling; an abode; a habitation; a home." (Cen. Dic. & Cyc.) An apartment is (1) "A room in a building; a division in a house separated from others by partitions. (2) A suite or set of rooms; specifically, a suite of rooms assigned to the use of a particular person, party or family." (Id.) The terms "tenement" and "apartment" are generically applicable to all kinds of human habitations; in the one case to any place of human abode, and in the other to any division of such abode. Definitions of these terms are to be found in all of the older dictionaries such as Johnson's (1818), Craig's (1859), Worcester's (1860), but "tenement houses" were not mentioned until later, and definitions of "apartment houses" are of still more recent origin. The Century Dictionary defines a "tenement house" as "a house or block of buildings divided into dwellings occupied by separate families; technically in the State of New York any house occupied by more than three families. In ordinary use, the word is restricted to such dwellings for the poorer classes in crowded parts of cities." The same authority defines an "apartment house" as "a building divided into separate suites of rooms intended for residence, but commonly without facilities for cooking, and in this respect different from a flat, though the two words are often used interchangeably; also distinguished from tenement house." Other definitions, varying in amplitude, but all of similar import, are to be found in the various dictionaries now extant, and a single further extract from the New International Encyclopædia of 1903, will serve to illustrate how little the science of lexicography has contributed to apt, definite and perspicacious definitions of the terms under consideration, and how much we are dependent upon popular usage and common understanding when in search for practical and concrete definitions of such terms. The authority last cited defines an "apartment house" as "a building arranged in three or more suites of connecting rooms, each suite designed for independent housekeeping but with certain mechanical conveniences, as heat, light, or elevator service, furnished in common to all the fami-

lies occupying the building. Legally there is no difference in the United States between an apartment house and any other tenement. Popularly, the apartment differs from the tenement in the greater elegance of architectural finish, in the larger number of conveniences, and in the greater complexity of mechanical service furnished to all tenants from a central point. Midway, in popular usage, between the tenement house on the one hand, which is the home of the poor, and the apartment house on the other, whose annual rentals place it beyond the means of those with moderate incomes, stands the flat, which like the cottage of the suburb, is designed for people of moderate means."

Passing from the so-called legislative and lexicographic definitions, the next consideration in logical sequence is the covenant itself. It inhibits the erection and maintenance of a "tenement house." And, of course, the first question that occurs to the legal mind in the consideration of this covenant is: What does the term "tenement house" mean? In the absence of exact, scientific and practical definitions framed either by the legislature or by the lexicographer, or by both, it is obvious that we must look to other sources for light upon the subject. We naturally turn to the covenant and the conditions in which it was made. The covenant is long and comprehensive. Every trade, industry or calling that is dangerous, offensive or noxious to the neighboring inhabitants is interdicted. And by what names are these things called? Coal yards, slaughter houses, meat shops, tallow chandleries, steam engine and smith shops, forges, furnaces, foundries; glass, gunpowder, starch, glue, varnish, vitriol, ink, petroleum or turpentine manufacturies, coopers, carpenters, cabinet makers shops; tanneries for tanning, dressing, preparing or keeping skins, hides or leather; breweries, distilleries, sugar refineries, bakeries, railroad depots and stables, car and engine houses, drinking establishments, menageries, circuses and public shows. This is the company in which we find the term "tenement house" as used in this covenant. When we consider the juxtaposition of this term to the numerous

things that are obviously noxious, noisome or dangerous we begin to see in the context of the covenant a definition of the term "tenement house" that is much more exact and practical than any of those which we have been considering. Classed with a great variety of recognized nuisances, the "tenement house" of this covenant was clearly meant to be the abode of squalor, filth, disease, disorder and crime, which had been the subject of legislative investigation and regulation in 1867, which continued to exist in 1873, and which in its peculiar sphere was quite as noxious, noisome and dangerous as any of the other things inhibited by the covenant. (*People* v. *Richards*, 108 N. Y. 137; *People* v. *N. Y. & Manh. Beach Ry. Co.*, 84 id. 565; *Sims* v. *U. S. Trust Co.*, 103 id. 472, 479, and *Matter of Hermance*, 71 id. 481.) This intrinsic and almost conclusive revelation of the intent of the covenanting parties is strongly reinforced by evidence of extrinsic but pertinent facts. The only "tenement house" then known in the city of New York was that which had aroused the generous impulses of the philanthropists and the vigilance of the public health authorities. It was guarded against in the same covenant and for the same or similar reasons that operated in specifying so many other things that would probably never infest or infect the neighborhood, but that must nevertheless be mentioned to prevent even the remotest possibility of their appearance. This was residential property of the better class; and in that circumstance the plaintiffs think they find support for the argument that it could not have been intended to guard against the kind of "tenement house" which was already effectually excluded from the locality by the quality of its buildings and the price of the land. The same argument may just as well be made as to any of the other forty inhibited things. If the neighborhood was too good and the land too valuable for a "tenement house" of the meaner sort in 1873, it was quite as obviously above the level of blacksmith shops, slaughter houses, tallow chandleries, etc., and there was no more occasion for mentioning any of these than there was for referring to a "tenement house," except as the obnoxious

features of each suggested the prudence, if not the necessity, of guarding against them all. The defendant's apartment house differs from the adjoining structures chiefly in its greater size, its larger cost, its more elegant and complete equipment, and the number of its inhabitants. Many of the conveniences and elegancies contained in it were unknown even in the mansions of the rich in 1873, to say nothing of the "tenement houses" of that day. It has already been observed that the "apartment house" of 1900 was unknown and undefined in 1873, and unless this term is but another name for a "tenement house," it cannot be brought within the scope of the covenant. We have seen how unsatisfactory mere word definitions are when applied to expressions which are coined for colloquial or popular use and which are the outgrowth of local or contemporary conditions. In the light of these considerations it proves nothing to say that the difference between the "tenement house" of 1873 and the "apartment house" of 1900 is simply one of degree. The difference is not simply of one degree; there are many. And what makes a difference in kind but the difference by a sufficient number of degrees? We have here an "apartment house" as different from the "tenement house" in the character of its inhabitants, in the style of its architecture, in the number and variety of its equipments and, in short, in all the essentials that can differentiate one place of human abode from another, as the palace of a king is different from the straw thatched hut of one of the poorest of his subjects. It is doubtless true that an "apartment house" like the defendant's is objectionable to many of the residents of the city of New York who are fortunate enough to be still able to live in their own private residences; quite as objectionable, indeed, as a hotel, although the latter is not in the interdicted list; but in the development of a great city sentiment must yield to necessity. The truth is, that the housing of the middle classes in the city of New York is as much of a problem to-day as was the housing of the poorer classes prior to 1873, and the wishes of the few must give

way to the welfare of the many, except when progress is effectually barred by explicit covenants or other paramount conditions. In this connection it is to be remembered, moreover, that this is a restrictive covenant which is in derogation of the common-law right to use land for all the lawful purposes that go with title and possession, and that such covenants are not to be extended by implication. (Lloyd's Law of Buildings, sec. 148; Hamilton's Law of Covenants, under head of "Restrictive," pages 20–21; *Duryea* v. *Mayor, etc., of N. Y.,* 62 N. Y. 592, 596.) The primary rule of interpretation of such covenants is to gather the intention of the parties from their words, by reading, not simply a single clause of the agreement, but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met. (Jones' Law of Real Property, sec. 735; *Clark* v. *Devoe,* 124 N. Y. 120, 124.)

A brief review of the authorities will disclose the attitude of our courts toward covenants and definitions like those under consideration. In *Musgrave* v. *Sherwood* (53 How. Pr. 311) the Supreme Court, on application for a preliminary injunction, delivered an opinion in which the argument of "difference in degree and not in kind" was strongly emphasized, but when the case came on for trial the court held that a family hotel, provided with separate suites of rooms for each family, and a dining room common to all, was not repugnant to a covenant prescribing that premises should not be used for "any stable, *tenement house,* coal yard, slaughter house," etc.

In *Levy* v. *Schreyer* (27 App. Div. 282) the covenant was against "tenement houses," or any "houses except private dwellings," and the court held that a house internally arranged for the accommodation of three families, although externally not essentially different from adjoining private dwellings, offended against the covenant because it was not a private dwelling house, and that was the ground upon which the decision was affirmed in this court. (177 N. Y. 293, 294.)

In *Sonn* v. *Heilberg* (38 App. Div. 515) the covenant

required that the building "should be in every way adapted for use as a family residence," and the erection of a six-story apartment was held not to be a violation of the covenant.

In the case of *Boyd* v. *Kerwin* (15 N. Y. Supp. 721) the court at Special Term denied a motion for an injunction, which was applied for upon a covenant almost identical in its phraseology with the one at bar, and where the complaint was that the defendant threatened to erect six apartment houses. The court declined to decide the question upon affidavits, but wrote an opinion in the course of which it said : " From the connection of the word 'tenement' and other kinds of business forbidden and of houses prohibited by the covenant, it would seemingly require that the construction to be given to the word 'tenement' should be similar to that given to the covenant in the *Musgrave* case as something 'noxious or offensive,' and, therefore, applicable to that class of tenements which, as distinguished from flat or apartment houses, are occupied by a number of poorer families."

In *White* v. *Collins B. & C. Co.* (82 App. Div. 1) the covenant was like the one at bar, the titles there having been derived from the same grantor as the titles before us. The defendant was proceeding with the erection of an apartment house upon its premises when the controversy which grew out of that fact was submitted to the learned Appellate Division of the first department. In speaking for that court Mr. Justice INGRA-HAM said : " Considering the object for which this covenant was intended, and the nature of the various uses that were prohibited, it must be apparent that the building that the defendant proposed to erect is not a tenement house within the meaning of the covenant, and was not in the contempla-tion of the parties when the instrument was executed. An apartment house, the erection of which is contemplated by the defendant, would clearly not be a use of the property which would be dangerous, noxious or offensive to the neigh-boring inhabitants. What was clearly contemplated was that a tenement house as then known and in use in the city of New York should not be erected upon the property. The

erection of a hotel was not prohibited, nor was the use of the property restricted to dwelling houses so constructed that one dwelling should be under each roof. The restriction was confined to one particular residential use, viz., a tenement house. What was contemplated was that the building of a tenement house as then understood in New York should not be allowed, but the modern apartment house is a building entirely distinct from what was then understood as a tenement house."

Thus we see that the trend of authority, the rules of construction applicable to restrictive covenants, the context of the covenant at bar, and the meaning of the term "tenement house" as explained by conditions existing when the covenant was made, and viewed through the perspective of subsequent developments, all combine to uphold the defendant's contention that her "apartment house" does not fall within the restriction upon her title.

We think the extra allowance of costs should not have been granted. Under the Code (Sec. 3253) such an allowance must be based upon "the sum recovered or claimed, or the value of the subject-matter involved." Here there was no sum recovered or claimed, and there is no allegation, proof or finding as to the value of the subject-matter involved. There is, therefore, no basis for the allowance, and it was error to grant it. Conceding, for the purpose of the discussion, that the action was "difficult and extraordinary" within the meaning of the Code, it is, nevertheless, entirely barren of facts upon which to make a computation for such an allowance. No sum of money was asked for or recovered. The subject-matter involved was incapable of valuation. It is entirely clear, therefore, that the attack of the plaintiffs upon the order granting the allowance goes to the power of the court rather than to any question of discretion where the power exists but the manner of its exercise is the subject of criticism. Here the jurisdiction of the court to make any allowance is assailed, and we have frequently held that such an order is reviewable by this court when properly brought up. (*Johnson* v. *Shelter*

*Island Grove & C. M. Assn.,* 122 N. Y. 330 ; *Hanover F. Ins. Co.* v. *Germania F. Ins. Co.,* 138 N. Y. 252 ; *Standard Trust Co.* v. *N. Y. C. & H. R. R. R. Co.,* 178 N. Y. 407.)

The judgment of the court below should be modified by reversing that part which affirms the order granting an extra allowance of costs, and as thus modified the judgment should be affirmed, without costs to either party in this court.

Gray, J. (dissenting). I dissent, emphatically, from the determination reached by the majority of the court. I do so upon the ground that neither in any changed conditions of the neighborhood, nor in any legal distinction between the term "tenement house" and that of "apartment house," is there any justification for denying to plaintiffs the equitable relief demanded. It is not a matter of discretion ; for it is a general rule of equity that, when there is a breach of such a covenant, a sufficient ground is afforded for the court to interfere by injunction. (*Tipping* v. *Eckersley,* 2 K. & J. 264 ; *Barrow* v. *Richard,* 8 Paige, 351 ; *Trustees of Columbia College* v. *Lynch,* 70 N. Y. 440 ; *Rowland* v. *Miller,* 139 ib. 93, 102.) I concede that the court might refuse to exercise its restraining power, if the case were one where the conditions had so changed, beyond the probable expectations of the parties, that the enforcement of a covenant of this nature would impose great hardship upon the defendant and could cause no benefit to the plaintiff. That was the case of *Trustees of Columbia College* v. *Thacher* (87 N. Y. 311); where the property, being a dwelling house on Sixth avenue, in New York city, was so injuriously affected by the construction of the elevated railroad, as to render it unfit for the purpose of a dwelling house and only profitable when used for business purposes. But, in this case, the ground for equitable interference is as firm, and the need is just as great, as when, under the protection of the covenant, purchasers improved the land and confidently erected their private dwellings. What is the condition to-day, as compared with that of 1873 ; when the covenant was made ? Then, the land affected was an unim-

proved tract, somewhat under tillage ; whose natural advan-
tages in situation suggested to Dr. Harsen's executors the
possibilities of great value, in laying it out for residential sites
of the highest class; protecting, for the future, the neighbor-
hood, in that respect, by mutual covenants with the purchasers.
They carried out the idea and sold off the lots, with the restric-
tive covenant in each deed.    Private residences of a more or
less expensive character were constructed and the plaintiffs,
with others, purchased in reliance upon the covenant and its
enforceable observance, by all owners of the land.    Until the
act of the defendant, now complained of as a breach of the
covenant, the neighborhood has not been affected, in its quiet
residential character.    It is impossible to say that the purpose
of the restrictive covenant has ceased and, in my opinion, this
determination is subversive of the valuable rights, intended,
and supposed, to be secured by such an agreement.    The
fancied security, in which the plaintiffs have dwelt, has been
swept away and they are told that the evolution of the tene-
ment house of former days into the apartment house of the
day is such an alteration in conditions as to render the covenant
unenforceable.    There is no protection in statute, or in ordi-
nance, and their covenant affords none, against the towering
apartment house ; which affects the passage of the light and
of the air, which brings the noise and disturbance of a human
beehive and which is irresponsible for the orderly, or respect-
able, character of its tenants.    And the legal pretext for the
refusal to enforce this covenant is that an " apartment house "
is not comprehended within the " tenement house."    I say
that there is, legally, no distinction between the two and that
whatever the difference in wealth of occupants, in equipments
and furnishings, or in architecture, it is not real, in the eye of
the law, but is one of accidental attributes.    A tenement
house meant, as it means to-day, a house, or building, so sub-
divided as to permit of its occupancy in distinct tenements by
different persons, or families.    That is the primary sense of
the term and it is that interpretation, which its use in the
covenant should receive, in the interest of a greater degree of

certainty in the administration of the law. What is the term " apartment house " but the adaptation of a name from the French language, signifying a house dwelt in by several families? First called " French flats," that, as well as " tenement house," became offensive to the polite ear and so the term " apartment house " was adopted. But, in construing this covenant, we are dealing with the language of a deed, carefully drawn by legal hands, and not with conversational terminology. If we are not to give to " tenement house " its legal meaning of a community house, where shall we draw the line of distinction between the two kinds of tenement houses? Shall it be in the accessories of internal arrangement, or of fittings? But those are accidental; being less complete and costly in one than in another house. One may be, as here, of more ornate architecture and finish; but, in the end, each is a community house. What shall be the number of the fittings, their character, or the cost, which will classify the general building as the one, or the other, kind of house? Shall the amount of the rentals asked mark the distinction? If so, what amount of rental moneys shall distinguish the undesirable tenancies of a poorer class of people from those of a richer class, whose abodes may not be characterized as tenements? The argument made here, as below, is fallacious. As the able counsel for the appellants well puts it, " when the parties provided for a covenant against tenements, they meant tenements of all kinds, * * * no matter what new, or fancy, name might be applied to them. * * * 'Any tenement house' means any tenement house, old style, or new style; unless this court is to make over the covenant, as the courts below did." About the time of this covenant, it was appreciated that a higher class of tenements would be more or less violative of its obligation; if we regard the discussion upon the subject by a very capable justice of the Supreme Court, in 1877, in the case of *Musgrave* v. *Sherwood*, (53 How. Pr. 315). In that case, Judge Westbrook granted an injunction against converting some private houses on Fifth avenue into a " French flat, or an apartment house," because it would be

violative of a covenant against any "tenement house." He pointed out, in an opinion, the difficulty in confining the definition of tenement house to abodes of poor families and said that "there is no fixed standard by which poverty and wealth can be measured," and, again, he says, "will the name of the building change as its occupants change? Manifestly * * * not."

The argument *noscitur a sociis*, to which, in effect, my brother WERNER resorts, can have no application; because the question is not what the term "tenement house" means; it is whether the covenant restricted the neighborhood against the future erection of what would be, in fact, a community house. To those, who are familiar, by residence, or by observation, with the menaces to property values in a great city like New York, in the municipal growth and in the unregarding and aggressive spirit of gain, it is plain that such a restrictive covenant carries with it to intending purchasers a legal assurance as to the character of the neighborhood, upon which they are warranted in relying. Consider what the defendant's act means. Upon a wedged shape block, with some 153 feet of frontage and some 126 feet of rear line, three distinct buildings, of seven stories in height, are constructed. Each has fourteen tenements, or, of politer sound, apartments; which, in the total, amount to forty-two and which, allowing five persons to a family, house a community of 210 persons, without reckoning servants. That means, not only, those probable annoyances, which the propinquity of such buildings gives rise to; but it means the possibility of objectionable tenants, against whom the apartment house affords no guaranty, as would the hotel. In answer to the suggestion as to the high class character of this house, it may be said that the most expensive apartment rents for $1,000, and the cheapest for $600; figures that leave to inference, from their lowness, the character of the tenants who will occupy the various tenements. Thus the peace, the privacy and the respectability of the neighborhood may be endangered, and the property owner is deprived of that measure of

28

enjoyment of his residence, upon which he, legitimately, counted. Nothing has occurred to justify the non-observance of the covenant, which restricted this locality to private dwellings. The railroad, under the bluff and on the shore of the Hudson river, was there in 1873 and, obviously, it was contemplated as continuing there. The defendant is not, as the appellant's counsel suggests, "conforming his property to any change in the neighborhood, but is himself introducing the change."

I think this case to be within the doctrine of *Trustees of Columbia College* v. *Lynch*, (70 N. Y. 440), and of *Rowland* v. *Miller*, (139 ib. 93). These cases held, in substance, that the purpose of such a covenant is, by restrictions, to make the lots of land more available and desirable, as sites for private residences of the first class, and to assure to the owners the right to occupy their dwellings without any of those menaces to the character of the neighborhood, which the different uses, comprehended within the descriptive words of the covenant, might constitute.

For these reasons, I vote for the reversal of the judgment.

O'BRIEN, HAIGHT and VANN, JJ., concur with WERNER, J.; CULLEN, Ch. J., and BARTLETT, J., concur with GRAY, J.

Judgment affirmed.