CATHERINE W. LIGNOT et al., executors, &c.,

*v.*

J. EDWARD JAEKLE.

[Decided November 18th, 1906.]

1. On a bill by grantors against grantees in a deed to enforce a restriction contained in the deed against the construction of a flat or tenement-house, evidence considered, and *held* to show no waiver of the restriction.

2. Any building consisting of more than one story, in which building there are one or more suites of rooms on each floor equipped for separate housekeeping purposes, is a "flat," within the meaning of a restriction in a deed that the grantee shall not permit to be erected on the premises any building which shall be used or occupied as a flat.

3. If what is known as a "flat" becomes an "apartment-house" when higher rental is charged, the payment of a rental of from $35 to $40 per month does not turn what is otherwise a "flat" into an "apartment," so as to take it out of a building restriction binding the grantee not to erect a flat on the premises.

4. Where a grantor, retaining a portion of the land, enters into a written understanding with the grantee restricting the enjoyment in order to benefit the portion retained, and the restriction is reasonable, it will be enforced in equity against the grantee.

5. If a grantee claims that his deliberate disregard of a building restriction written in a grant does not damage the grantor, he must make his position clear beyond the possibility of doubt.

6. In an action by grantors against grantees to enforce a building restriction contained in a deed, evidence *held* to show that complainants were not guilty of laches.

On pleadings and proofs.

*Messrs. Hudspeth & Carey,* for the complainants.

*Mr. I. Faerber Goldenhorn,* for the defendant.

GARRISON, V. C.

This is a bill filed by the executors of Peter Joseph Jules Lignot against J. Edward Jaekle to enforce against the latter a

restriction contained in a deed from the complainants to the defendant.

The complainants are executors and trustees under the will of Peter Joseph Jules Lignot, with power of disposition of his property.

Peter Joseph Jules Lignot died in 1887 seized of a large tract of land in the Greenville section of Jersey City. At the time of his death this property consisted of a mansion-house or homestead and the usual buildings in connection with such, the rest of the land being orchard or meadow land. The complainants have retained the mansion-house and its appurtenances, and continue to live therein.

In 1888 the executors had the rest of the property surveyed, laid out in building lots, and cut two courts through from Linden avenue. The property is bounded by Linden avenue on the west, the property late of Lembeck on the east, Ocean avenue on the south, and Garfield avenue on the north. The property on Ocean avenue was sold for any purpose for which such land might be used, so that stores, flat buildings and other business structures might be there located. The conveyances so far made of the rest of the property contain practically the restriction contained in the Jaekle deed. I say "practically," because, from an inspection of certain of the deeds put in evidence, it appears that the cost of the houses to be put upon the property varied, those on Linden avenue to be of a higher cost than those on the courts. But each were restricted, as to the character of the building, as in the Jaekle deed. That restriction, so far as we are concerned with it, is contained in the following language:

"That the said party of the second part [which is the defendant, J. Edward Jaekle], his heirs or assigns, shall not at any time hereafter erect, or cause, procure, permit or suffer to be erected, on said premises, or any part thereof * * * any building that shall be used or occupied as a flat or tenement-house."

The deed to Jaekle is dated January 9th, 1903. The deed was delivered and the consideration paid at the home of the complainants on the day that the deed was acknowledged, January 14th, 1903. There were present at that time Dr. Lignot, the

complainant; his mother, Mrs. Catherine W. Lignot, the other complainant; a brother of Dr. Lignot, named Paul; C. W. Wenner, the master; J. Edward Jaekle, the defendant, and his attorney, I. F. Goldenhorn. The two latter witnesses testify that at that time Mr. Goldenhorn, after the deed had been delivered, in the course of a general conversation, stated that it was the intention of Mr. Jaekle to erect a two-family house upon the property, and that he (Jaekle) and his father intended to live in the same. They testify that Mrs. Lignot responded by saying that she had no objection to them as neighbors. This is the consent which the defendants allege was given at that time to the defendant's erection of the building subsequently planned and erected.

This conversation is specifically and *in toto* denied by the other four parties present.

In February the plans for the structure were exhibited by the defendant to Dr. Lignot, and some negotiations or conversations concerning the matter of erecting that kind of a house upon this property were had between Mr. Hudspeth, the attorney of the Lignots, and Mr. Goldenhorn, the attorney of the defendant.

On the 1st of March, 1906, Mr. Goldenhorn addressed a letter to Mrs. Lignot, in which he states that his client is about to erect a two-family apartment-house upon the lots, and that if the Lignots have any objection they should at once take proceedings to make the same effective, or the defendant will assume that they are willing and consent to the erection of such a house upon the lots. This letter was mailed on Saturday, the 3d day of March, and was presumably received by Mrs. Lignot on Monday, the 5th, and was then taken by Dr. Lignot to Mr. Hudspeth, who, on the 10th of March, responds to the same. The reply informs Mr. Goldenhorn that the Lignots do not consent; that they hold that such a structure violates the covenant, and that, if persisted in, suit for damages, or other proper proceedings, will be taken to protect the interests of the grantors.

Thereafter there were conversations at various times between the attorneys of the parties, the general purpose of each of the attorneys being to arrive at some sort of an understanding between the clients so that Jaekle could proceed with the erection

without interference by the grantors. It was the general understanding between them that Jaekle should endeavor to get the consents of the other grantees ·of the complainants whose properties were adjacent to Jaekle, and that Hudspeth would then endeavor to get the consent of the Lignots, the idea being that if the other grantees acquiesced the Lignots would not feel under pressure or obligation to continue their objection.

Since all the lots on Linden avenue were subject to this same restriction it was assumed by the parties that the other grantees of Linden avenue lots had some rights with respect to the character of the building to be placed on any lot.

The defendant testifies that some time in the early part of July of 1906 he met Dr. Lignot on the street and informed him that he was about to erect the house, and that Dr. Lignot stated he had no objections. Dr. Lignot denies this specifically.

In the latter part of July (probably upon the last day thereof) the defendant broke ground and proceeded with his excavation.

Mr. Hudspeth, shortly after this, left for his summer vacation, leaving his managing clerk in charge of this matter, and at an interview held in the early part of August between Mr. Goldenhorn and the managing clerk of Mr. Hudspeth, it was the understanding that Mr. Jaekle should not erect his house without obtaining the consent of the Lignots, and that he should, in any event, await the return of Mr. Carey, a partner of Mr. Hudspeth, who was to return before the latter.

Upon Mr. Carey's return further interviews were held along the same lines. On the 24th of August, 1906, Mr. Goldenhorn and the defendant visited Mr. Carey, having with them the plans of the building. They spoke of the consents of the adjacent owners that they had, or assumed that they had, and wanted Mr. Carey to· inspect the plans so as to see that the building would not be a detriment to the neighborhood. Mr. Carey stated that he was not interested in the plans, that his sole interest was to protect his clients, and that he ·would like to see the matter amicably arranged for every reason, and that if the defendant would get the consent of the complainants there would be no further difficulty, and he suggested that they go to the complainants and endeavor to obtain their consent.

On the night of that day the defendant and Mr. Goldenhorn went to the residence of the complainants and ascertained that the doctor was not at home, and that Mrs. Lignot was not able to see them, whereupon they delivered their message and plans to a daughter of Mrs. Lignot, who promised to let them hear from her mother in a few days.

At the interview with Carey last mentioned it was the understanding that the parties were to await the return of Mr. Hudspeth if they did not obtain the consent of the grantors. Mr. Hudspeth returned some time after Labor day (September 3d, 1906), and found that the framework of this building was up, and thereupon filed the bill in this suit on the 17th of September, 1906.

I am entirely convinced from all of the testimony that there was no positive, direct agreement, consent or acquiescence on the part of the grantors to permit the grantee to erect the building in question. While there were a great many interviews between the parties in interest, I think it entirely clear, and that the conduct of the defendant demonstrates, that he never secured from the complainants any direct permission, consent or acquiescence to the erection. The impression left upon my mind by the testimony is that the complainants did not themselves have any violent or obstinate objection to the erection of the building in question. They feared that if this building, which they deemed a "flat," was erected, other grantees subject to a similar restriction might erect cheaper houses of the same character, to the detriment of the neighborhood and the injury of the property in the same plot still retained by the complainants. The building that the defendant proposed to erect was to be of good architecture, fine appearing and costly, being much more costly than almost any other house in the neighborhood. I think that the complainants feared also that other grantees whose deeds contained similar restrictions, and who had erected private dwelling-houses there, would come upon them if they were to consent to the erection of the Jaekle building, and that therefore they and their counsel constantly stated to the defendant that they had no objection themselves if the consent of the other grantees could be obtained, but that in default of such consent being obtained,

they maintained, in its rigidity, all of their rights, and did object. This, I think, explains the apparent contradiction between the parties, and shows that it is not a real contradiction.

The complainants are truthful and correct in their testimony that they did not consent to the erection of this building, did not acquiesce in it, and did always object to it, whereas the defendant is also correct in saying that they stated that they had no objection to it, their objections being not personal, but based upon the failure of the defendant to obtain the consent of the other grantees.

That brings us to the construction of the language of the covenant in relation to the facts.

The language previously quoted is that the grantee is not to erect "a building to be used or occupied as a flat or tenement-house." The house which the defendant has planned and partially erected is a two-story and attic house, which is to cost about $10,000, with an entrance in front, from which access is obtained both to the first and second floors by separate hallways. Upon the first floor is a complete housekeeping suite, and a similar one upon the second floor.

The exact question to be determined is whether the building in question is one to be used or occupied as a "flat or tenement-house."

The complainants have not argued that the house in question is a "tenement-house" within the meaning of the restriction. It is, of course, elemental that the word "tenement," etymologically speaking, would cover any sort of a house which was of a permanent nature and could be holden, but by the use of the term the parties undoubtedly meant a community-house of a certain kind. I think it clear that those words, as used here, meant a community-house occupied by persons of small means, the distinguishing characteristics of which are the use in common of certain facilities by people crowded into insufficient space and deprived of many of the essentials of privacy, decency and health. This is the meaning given to the phrase in *Kitching* v. *Brown, 180 N. Y. 414*. In that case there was a very strong dissent, however, based upon the principle that the court could

not, and should not, distinguish between different kinds of tenement or community-houses.

A "flat," etymologically, is a floor in a building. Later the use of the word became restricted to a floor completely equipped for housekeeping purposes. A building containing such floors, so equipped, each of which is called a "flat," is itself termed a "flat," but, more properly speaking, should be termed a "flat-house."

The question to be decided in this case is, How many such floors must a building have to come within the term of "flat" or "flat-house?"

It should first be observed that, in my view, the floor completely equipped for housekeeping purposes must be in a building in which there are other floors, because I do not think that a bungalow or ranch building all on one floor has ever properly been termed a "flat," or the building a "flat-house." In this country flats or flat-houses have usually been built of many stories, upon each floor of which buildings there has been one or more suites of rooms fitted up for housekeeping purposes. The query is, How many stories, so equipped, must there be to constitute the building a "flat" or "flat-house?"

In default of any arbitrary definition established either by positive enactment or by decision, I think it must be held that any building consisting of more than one story, in which building there are one or more suites of rooms on each floor equipped for separate housekeeping purposes, is a "flat" or "flat-house." I do not see how the court can apply any other test that is reasonable. A floor equipped for separate housekeeping is a "flat." A building containing such "flats" is a "flat-house." If two such floors do not so constitute it, how many would? There is no answer of which I am aware.

The fact that it has not been customary to erect "flat-houses" of only two stories cannot alter the conclusion.

I do not see upon what one could base a finding that a "flat-house" must consist of more than two stories.

In *Skillman* v. *Smatheurst,* 57 *N. J. Eq.* (12 *Dick.*) 1 (at p. 5), Chancellor McGill said of a "flat" or "flat-house:" "It is really a community-house, designed for the accommodation of

more than an individual and his household." In that case the building consisted of three stories, upon each floor of which building there were apartments equipped for housekeeping, and the court designated it as a "flat" or "flat-house."

The defendant contends that this restriction does not limit the character of the building to a private dwelling, and that it does not forbid the erection of what is termed a "two-family house;" that is, a house so built that two families may live therein, side by side, separated by a dividing wall, and therefore this house in question, which is built for two families to reside one above the other, is also permitted. This contention seems to me to be without merit. If I am correct in my holding that the house in question is a "flat" or "flat-house," then it is prohibited by the restriction, and the fact that some other house answering the same purpose could be built without violating the restriction is immaterial and irrelevant. It only serves to show how readily the defendant could accomplish his purpose without violating the covenant.

Nor is the defendant helped by terming this building an "apartment-house," and claiming that then it is not within the restriction. An "apartment-house" is either a building otherwise termed a "flat" or "flat-house," or it is a building divided into separate suites of rooms intended for residence, but commonly without facilities for cooking, &c. *Kitching* v. *Brown, supra.*

The building in question does not come within the latter part of the above definition, because each suite in it is to have separate facilities for cooking.

The court in the case just cited finds that the terms "flat-house" or "apartment-house" are used interchangeably, and mean the same thing, the only difference being that when the rent is cheap the building is customarily referred to as a "flat" or "flat-house," whereas when the rent is higher, the politer term is "apartment" or "apartment-house." There is no distinction with respect to the nature of the building or its use.

Where the interdicted thing is indicated clearly, as it is in the case at bar, mere nomenclature will not be allowed to prevail in deciding the rights of the parties. The thing intended to be

prohibited by this covenant, which was drafted about 1888, was the erection upon this property of community-houses termed "tenement-houses" or "flat-houses." The fact that the latter character of house as it became more costly has a different name, used interchangeably with its old name, cannot vary or alter the rights of the parties. The only distinction suggested by anyone between an "apartment" and a "flat" is the amount of rent. Highly ornate private dwellings are often .termed "mansions," but it certainly could not be successfully contended that if land were restricted so that it might not have erected on it a private dwelling one could erect a costly dwelling thereon and, by calling it a "mansion," prevent the enforcement of the restriction.

Furthermore, I do not find that the amount of rent to be charged for these suites (namely, $35 to $40 per month) brings the same within the definition contended for by the defendant. His sole contention on this head is that what is otherwise a "flat-house" becomes an "apartment-house" when a certain amount of rent is charged. It is admitted that there is no standard with respect to what amount of rent converts a "flat" into an "apartment," but fairness to the defendant does not require from him an absolute definition, provided there is any reasonable method of ascertaining the limits. Undoubtedly, if the distinction be a true one, there are means and extremes about which there could be no question. A suite renting for $10 a month would then undoubtedly be a "flat," whereas one renting at $1,000 a month would undoubtedly be an "apartment." Granting, therefore, for the sake of the argument, that there is this distinction, and that it is a real one, I do not find that $35 to $40 a month rent turns what is otherwise a "flat" into an "apartment."

It is the settled law of this state that where a grantor, retaining a portion of the land out of which the grant is made, enters into an express written understanding with his grantee which restricts the enjoyment of the portion of the land conveyed in order to benefit the portion retained, and the restriction is reasonable and consonant with public policy, such restriction will be enforced in equity against the grantee at the instance of the grantor. *Hayes* v. *Waverly & P. R. Co., 51 N. J. Eq.* (*6 Dick.*) *345* (at *p. 348*) (*Chancellor McGill, 1893*); *Cornish* v. *Weiss-*

*man, 56 N. J. Eq. (11 Dick.) 610* (at *p. 613*) (*Vice-Chancellor Emery, 1898*) ; *Roberts* v. *Scull, 58 N. J. Eq. (13 Dick.) 396* (*Vice-Chancellor Grey, 1899*).

And if the defendants rely upon an allegation that the complainants will not be damaged by the defendant's deliberate disregard of the restriction, they must make it clear beyond the possibility of doubt that the complainants cannot be damaged. *Cornish* v. *Weissman, supra; Morrow* v. *Hasselman, 69 N. J. Eq. (3 Robb.) 612* (*Vice-Chancellor Emery, 1905*).

There was no proof in this case by the defendant, and nothing from which he could successfully argue, that the complainants suffered no damage by his disregarding the restriction and building a "flat" upon the lot purchased from the complainants.

The complainants in the case in hand do retain a portion of the land out of which this grant was made. There is an express written covenant which does benefit the portion of the land still retained, and the restriction is reasonable and consonant with public policy. The restriction, therefore, will be enforced at the instance of the grantors against the grantee unless the former have in some way forfeited their right to insist on enforcement in equity.

They undoubtedly may forfeit such right by consent.

They may also lose it by abandonment or waiver.

If there is a general scheme embracing a large number of separate lots, and they permit others to violate the restriction, they may be held to have waived or abandoned it so as to lose their right to enforce it against a particular defendant. This latter, however, applies more strongly, if not solely, to cases where the right is equitable and not legal, and is most often applicable in cases where either the grantor seeks to enforce the right against someone other than his grantee, or where some other person than the grantor seeks to enforce the restriction.

Lastly, the right may be lost by laches.

It is contended by the defendant in the case at bar that the complainants consented or acquiesced in the erection of the building in question. I have found as a fact that this is not so.

It is next contended that by abandonment or waiver they have forfeited their right to enforce the restriction against the de-

fendant, because upon the tract of land in question there are two other houses, referred to in the testimony as "Kelsey's house" and "Thorn's house," each of which is occupied by two families. The defendant urges that the existence of these two houses, so equipped, shows an abandonment or waiver by the grantors of their rights. As has been before suggested, such a contention has great weight where someone other than the grantor is seeking to enforce a restriction, but is not so weighty when he is the actor. *Gamm* v. *Renner, 59 N. J. Eq. (14 Dick.) 307* (at *p. 309*) (*Vice-Chancellor Pitney, 1900*) ; reversed, but not on this point, *sub nom., Walker* v. *Renner, 60 N. J. Eq. (15 Dick.) 493*.

The basis of the principle is that where the scheme has been departed from by acquiescence or consent it is inequitable to enforce it thereafter. But it seems to me that it is elemental that the departure, if one exists, must have been acquiesced in or permitted, and it has been held that it is not every permitted infraction which will preclude the enforcement. *Hemsley* v. *Marlborough Hotel Co., 62 N. J. Eq. (17 Dick.) 164* (at *p. 172*) (*Vice-Chancellor Reed, 1901*) ; affirmed, *63 N. J. Eq. (18 Dick.) 804*.

The proofs show that on one of the courts there were erected two houses which exteriorly indicated private dwellings. One was referred to as "Kelsey's house," and the other as "Thorn's house," named from the persons who owned them. There was nothing in the appearance of either house to indicate that it was not a private dwelling-house. There is no evidence to overcome the denial on the part of the complainants that they knew that either of these two houses was fitted up for the use of two families living separately, one above the other. There is testimony that the Thorns informed the complainants that they intended to have two families in their house, but there is nothing to show that they informed the complainants that they intended to have these families dwelling in flats or floors separately fitted up for housekeeping, and this is the gist of the matter. All parties seem to agree that this restriction does not prohibit that which is termed a "two-family house," a house in which the families live under the same roof, side by side, separated by a dividing wall, or share a dwelling-house in common.

In default, therefore, of proof that there was any knowledge on the part of the complainants, or any implication of knowledge, I find that there was no permitted violation of this covenant, even if the law is that by permitting the violation of the covenant by one grantee the grantor loses the right to enforce it against another grantee.

Whether this is the law or not I do not decide, since it is not necessary.

The defendant's final insistment is that the complainants have forfeited the right to insist upon enforcement by reason of their laches. Whether this is so or not depends upon the proven facts. The proofs show that the digging of the cellar began on the 31st of July, 1906. Prior to that time, as I have stated in a previous part of this opinion, there had been numerous interviews between the parties or their counsel in which the question discussed was the erection of this building on this tract. The defendant had sought permission from the grantors, and had, as I find, failed to obtain it, and he thereafter continued to seek permission. The grantors had placed the matter in the hands of their counsel, Hudspeth & Carey. Mr. Hudspeth, of that firm, went away on his vacation just about the time that the excavation was begun, and upon his managing clerk's learning that the excavation had begun an interview was had between the said managing clerk and the attorney of the defendant, Mr. Goldenhorn, at which an understanding was reached that nothing in the way of superstructure should be proceeded with until the return of Mr. Carey, the partner of Mr. Hudspeth, who was expected home before Mr. Hudspeth. Upon Carey's return he was advised by his client that they were proceeding with the superstructure, and he got into communication with Mr. Goldenhorn and the defendant. It was then understood that they would stop any further work upon the building and not proceed until they had obtained the consent of the grantors, the complainants, and in default of obtaining such consent, would not proceed until Mr. Hudspeth returned. They did, however, proceed within a week, and Mr. Carey called Mr. Goldenhorn's attention to this, and that it was a violation of their understanding, which Mr. Goldenhorn admitted, and thereupon Mr. Goldenhorn again agreed that they

would not go on with the work without obtaining the permission of the grantors, and would, if such permission was not forthcoming, await the return of Mr. Hudspeth. Immediately after this interview the defendant and his attorney visited the Lignots to obtain consent. Work was continued upon the building, and when Mr. Hudspeth returned about the 10th of September the building was enclosed. Whether any work was done on the interior is uncertain. Mr. Hudspeth then caused the bill in this case to be prepared and filed.

I do not see how it can be said that the complainants are in laches. From the inception of the controversy they always maintained that the restriction forbade the erection of the building in question, and that they should insist upon enforcing the restriction. The defendant always sought consent and permission to erect the building, notwithstanding the restriction, and the defendant's counsel always advised his client that he had the right to erect the building without permission or consent; in other words, that the restriction did not forbid the erection of this kind of building. I think it clear that the defendant acted upon this view of the law.

The complainants, by promptly consulting counsel and taking the counsel's advice; by informing counsel of every move that was made upon the ground, which they appear to have done, certainly used all the vigilance that they could. Counsel for the complainants was in constant communication with counsel for the defendant, and rigidly insisted upon the rights of the complainants. If the defendant went on erecting the building in the face of this attitude of the complainants, and in spite of the agreements that he would not so go on, it seems to me that he is utterly without any ground for maintaining that the complainants were in laches. He did not erect the building in any doubt as to the complainants' attitude, or because the complainants did not promptly object, but he did whatever work was done with absolute knowledge that the complainants objected, and I find that he did it despite the agreements with the attorneys of the complainants that he would not do it. He therefore acted at his peril. *Kitching* v. *Brown, supra* (at *pp. 418, 419*).

I do not find, therefore, that the complainants are in laches.

My conclusion is that the complainants are entitled to an injunction to enforce the restriction.

Since, however, the building itself—that is to say, the exterior thereof—does not violate the covenant, there is no necessity for any injunction requiring the taking down of the building. The thing prohibited is a building to be used or occupied as a flat, and the injunction, therefore, will prohibit the use of this building in violation of the restriction.