(142 App. Div. 470.)

## GOODHUE v. CAMERON.

(Supreme Court, Appellate Division, First Department. January 6, 1911.)

1. COVENANTS (§ 5*)—BUILDING RESTRICTION AGREEMENTS—VALIDITY—"OWNERS IN FEE SIMPLE."

A building restriction agreement executed by persons who are "owners in fee simple" is valid, though not signed by the wife of one of the owners, and, where he and the wife subsequently executed a conveyance to a third person subject to the agreement, the property was subject to the agreement; the quoted words only meaning that the fee simple of the property was vested in the parties to the agreement.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 3, 4; Dec. Dig. § 5.*]

2. PRINCIPAL AND AGENT (§ 164*)— ACT OF AGENT — RATIFICATION BY PRINCIPAL.

An owner may ratify the execution of a building restriction agreement by his attorney, and convey the property subject to the restriction.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 622–625; Dec. Dig. § 164.*]

3. ACKNOWLEDGMENT (§ 36*)—REQUISITES—CONTENTS OF CERTIFICATE.

Under 1 Rev. St. (1st Ed.) pt. 2, c. 3, tit. 5, §§ 9, 15, providing that no acknowledgment of any conveyance shall be taken by any officer unless he shall know or have satisfactory evidence that the person making the acknowledgment is the individual described in the conveyance, and an officer taking the acknowledgment shall indorse a certificate thereof signed by himself, setting forth the matters required to be done, known, or proved, an officer taking the acknowledgment of an instrument executed by an attorney need not certify that he knew that the attorney was the attorney, or that the power of attorney was exhibited and known to him.

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 188–191; Dec. Dig. § 36.*]

4. PRINCIPAL AND AGENT (§ 19*)—EXECUTION OF INSTRUMENT BY ATTORNEY—POWER OF ATTORNEY—PRESUMPTIONS.

The execution of a valid power of attorney will be presumed in favor of an ancient deed purporting to be executed by attorney.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 36; Dec. Dig. § 19.*]

5. PROPERTY (§ 4*)—CONVEYANCES—INTEREST IN LAND.

A building restriction agreement is a conveyance of an interest in land.

[Ed. Note.—For other cases, see Property, Cent. Dig. §§ 4–6; Dec. Dig. § 4.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. EVIDENCE (§ 372*)—ANCIENT INSTRUMENTS.

A building restriction agreement more than 30 years old is an ancient deed, and a certified copy of the agreement is admissible in evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1613–1627; Dec. Dig. § 372.*]

7. PRINCIPAL AND AGENT (§ 19*)—ACT OF AGENT—RATIFICATION.

That a power of attorney, authorizing one to execute for the owner a building restriction agreement, existed may be presumed from the fact that the owner in a subsequent conveyance to a third person acknowledged that the land was subject to the agreement.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. § 36; Dec. Dig. § 19.*]

8. PRINCIPAL AND AGENT (§ 175*)—ACT OF AGENT—RATIFICATION.

An owner conveying land subject to a building restriction agreement executed by an attorney thereby ratifies the execution of the agreement relating back to the date of the agreement, and the agreement is as effectual as if original authority to execute it had been given.

[Ed. Note.—For other cases, see Principal and Agent, Cent. Dig. §§ 662–668; Dec. Dig. § 175.*]

9. COVENANTS (§ 69*)—BUILDING RESTRICTIONS—CONVEYANCES.

Where a conveyance of land to a grantee and subsequent conveyances were made subject to the covenants of a building restriction agreement, the property was charged in the hands of the subsequent owners, and they were estopped from denying the validity of the agreement.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. §§ 67–69; Dec. Dig. § 69.*]

10. MUNICIPAL CORPORATIONS (§ 225*)—CONVEYANCES—PROPERTY CONVEYED—EXHIBITS.

Where a deed by a city referred to a map of the common lands of the city filed in the city clerk's office, and to a particular survey annexed to the deed, it must be presumed to determine the land conveyed that the survey was a copy of the larger map of the common lands of the city so far as it related to the property conveyed, constituting a part of the common lands.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 639; Dec. Dig. § 225.*]

11. MUNICIPAL CORPORATIONS (§ 225*)—CONVEYANCES—PROPERTY CONVEYED—EXHIBITS.

Where a purchaser of lots of the common lands of a city at a sale in June, 1789, pursuant to a resolution of the council providing that a map of the lands to be sold should be exhibited at a designated place before the sale for examination by intending purchasers, obtained a deed in 1799, referring to a survey annexed to the deed and to a map of the common lands filed in the city clerk's office, and the deed was executed pursuant to a sale completed in 1789, it must be presumed to determine the land conveyed that the survey attached to the deed was a copy of the map exhibited at the designated place before the sale, and not to a copy of a map made subsequent to the purchase.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 639; Dec. Dig. § 225.*]

12. BOUNDARIES (§ 48*)—ESTABLISHMENT BY RECOGNITION.

Where a city discontinuing a road intended to devest itself of all the title thereto and to vest the same in the adjacent owners, and the titles of subsequent purchasers rested on the conveyances by the city, and for upwards of 60 years no one had questioned the validity of the conveyances as conveying the entire road, the conveyances and acts in reliance

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

thereon settled the boundary lines, and the location was conclusive on persons holding under subsequent conveyances.

[Ed. Note.—For other cases, see Boundaries, Cent. Dig. §§ 232–242; Dec. Dig. § 48.*]

13. ESTOPPEL (§ 35*)—BY DEED—AFTER-ACQUIRED TITLE.

The deed of a party purporting to convey land to which he has no title operates by way of estoppel on his subsequently acquiring title to the land.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 84; .Dec. Dig. § 35.*]

14. ESTOPPEL (§ 37*)—BUILDING RESTRICTIONS—LANDS INCLUDED.

Where a building restriction executed by owners in fee simple was executed by persons, none of whom owned a designated lot, and there was nothing to show an intention that such lot should be subject to the agreement, the fact that a party thereto subsequently acquired a fee-simple title to such lot did not under the theory of estoppel make such lot subject to the agreement.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 91–98; Dec. Dig. § 37.*]

15. INJUNCTION (§ 62*)—BUILDING RESTRICTIONS—REMEDY AT LAW.

Defendant owning land about one-fourth of which in area was subject to building restrictions proposed to erect such a building over the whole land as would violate the restriction. Plaintiff owning land subject to the restriction would suffer precisely the same annoyances from the erection and occupancy of the building on defendant's land as she would suffer if it was built only on the part of the land not subject to the restriction. *Held*, that plaintiff was not entitled to relief in equity, but she must resort to an action at law for damages.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 124–127, 129; Dec. Dig. § 62.*]

16. COVENANTS (§ 72*)—BUILDING RESTRICTION AGREEMENTS — DISCHARGE OF COVENANT.

That the property subject to a restriction agreement abutted on other property not restricted so as to impair the beneficial character of the covenant did not justify the owners of the property restricted in violating the restriction covenants controlling all the property included within the area restricted.

[Ed. Note.—For other cases, see Covenants, Cent. Dig. § 73; Dec. Dig. § 72.*]

Appeal from Order Entered on Report of Referee.

Action by Sarah C. Goodhue against Margaret S. E. Cameron. From a judgment entered on the report of a referee dismissing the complaint, both parties appeal. Affirmed.

The following is the opinion of the referee in the case of Sarah C. Goodhue against Margaret S. E. Cameron and the case of J. Pierpont Morgan and others against Margaret S. E. Cameron, tried together before the referee:

These cases present precisely the same question and the decision in each depends upon the same facts. Having been tried together, this opinion applies to each case.

The defendant contests the validity of the restriction agreement on two grounds: First, that it is not signed by Anna Vernon Murray, wife of John R. Murray, Jr., and is therefore void for lack of consideration; second, that the acknowledgment is defective, and, as the original agreement was not

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

produced, a certified copy from the record in the register's office was not admissible in evidence.

Neither of these objections can be sustained. The first point is based on the assumption that Anna Vernon Murray was an owner in fee simple of a part of the restricted territory. It is argued that the agreement so recited, and that, as the plaintiffs base their cause of action on the agreement, they cannot contradict its terms; that, Anna Vernon Murray not having signed the instrument, the mutual covenants failed, and with it the consideration. I disagree with the learned counsel in their construction of the agreement. I think the expression, "Whereas the several parties hereto are owners in fee simple," means no more, and was intended to mean no more, than that the fee simple of the property described was vested in the parties to the agreement. The agreement did not define what the precise interest of each party was, but recited only the fact that the whole ownership was vested in those who made the agreement. Certainly the expression does not necessarily mean what the defendant claims, and at least it is open to inquiry and construction. Interpreted as I interpret it, it is plain that Anna Vernon Murray's signature was not necessary to the validity of the contract. She was the wife of John R. Murray, Jr., and her interest in the property was inchoate. Had her husband died and had she acquired a vested estate of dower in a part of the property prior to its conveyance to Zabriskie, a different question would have arisen. But there is no proof to show whether or not she survived her husband, and we know that she was his wife on February 8, 1853, when the property on Madison avenue between Thirty-Fourth and Thirty-Fifth streets and 100 feet deep, was conveyed by her husband and herself to Martin Zabriskie and by the terms of that conveyance declared to be subject to the restriction agreement. It is established as a fact, therefore, by the testimony that Anna Vernon Murray had no vested interest or estate in the land at the time the restriction agreement was executed, and her signature therefore was not necessary to its validity.

This conclusion renders it unnecessary to consider what would have been the effect of the provision in the deed to Zabriskie which declared that the property was conveyed subject to the restriction agreement, had that agreement been void for the lack of Anna Vernon Murray's signature. It was plainly within the power of John R. Murray, Jr., to ratify the execution of the agreement by John R. Murray, his attorney, and convey the property subject to the restriction created by the agreement. To that extent the provision of the deed to Zabriskie was valid and effective.

The covenant that John R. Murray, Jr., and his wife were seised of the lands conveyed subject to the restriction, and the acceptance by Zabriskie of the title subject to the restriction, had not only the effect of ratifying the agreement by John R. Murray, Jr. (if execution on his behalf was in any respect defective), but also of subjecting the property to the restriction as against Zabriskie and his grantees, including the defendant. Trustees v. Lynch, 70 N. Y. 440 [26 Am. Rep. 615].

I am also of the opinion that the certificate of acknowledgment to the agreement is not defective, and that the certified copy was properly admitted in evidence. It was provided by 1 Rev. St. (1st Ed.) p. 758, pt. 2, c. 3, tit. 5, § 9, that:

"No acknowledgment of any conveyance having been executed shall be taken by any officer unless the officer taking the same shall know or have satisfactory evidence that the person making such acknowledgment is the individual described in and who executed such conveyance." By section 15 that: "Every officer who shall take the acknowledgment or proof of a conveyance shall endorse a certificate thereof signed by himself on the conveyance, and in such certificate shall set forth the matters hereinbefore required to be done, known or proved on such acknowledgment or proof," etc. The certificate of the commissioner of deeds on the restriction agreement complied with these provisions. The commissioner was not required to certify that he knew that John R. Murray was the attorney for John R. Murray, Jr., or that the power of attorney was exhibited and known to him. Lovett v. Steam Sawmill Ass'n, 6 Paige, 54; Johnson v. Bush, 3 Barb. Ch. 240.

The cases cited by the learned counsel for the defendant are not in point.

In Fryer v. Rockefellow, 63 N. Y. 268, the certificate failed to state that the parties acknowledging were known to the officer to be the same persons described in and who executed the instrument. To the same effect is Paolillo v. Faber, 56 App. Div. 242 [67 N. Y. Supp. 638]; Freedman v. Oppenheim, 80 App. Div. 488 [81 N. Y. Supp. 110]. In Irving v. Campbell, 121 N. Y. 353 [24 N. E. 821, 8 L. R. A. 620], the certificate failed to state the place of residence of the subscribing witness. In Bradley v. Walker, 138 N. Y. 291 [33 N. E. 1079], the certificate did not state that the wife acknowledged on a private examination separate and apart from her husband that she executed the instrument freely without fear or compulsion from him. In all these cases the officer taking the acknowledgment failed to certify facts required by the Revised Statutes to be certified at the time the instruments were executed. In the case at bar the person executing the restriction agreement was John R. Murray, and all that the statute required was that the commissioner taking the acknowledgment should certify that John R. Murray was known to him to be the person described in and who executed the instrument. The power of attorney was necessarily contained in a separate instrument which would have been required to have been separately acknowledged in order to be recorded. While such instrument has not been produced and no proof given that it ever existed, the authorities support the proposition that the execution of a valid power of attorney will be presumed in favor of an ancient deed purporting to be executed by attorney. Ensign v. McKinney, 30 Hun, 249; Doe v. Phelps, 9 Johns. 170; Doe v. Campbell, 10 Johns. 475; Robinson v. Craig, 1 Hill (S. C.) 389; Reuter v. Stuckart, 181 Ill. 529 [54 N. E. 1014]. The restriction agreement is a conveyance of an interest in land, and, being more than 30 years old, is to be treated as an ancient deed. A certified copy of the agreement was therefore admissible in evidence. That the power of attorney actually existed may be inferred from the fact that in the conveyance to Zabriskie in 1853 John R. Murray, Jr., acknowledged that the land was subject to the agreement.

But, even if this was not evidence of the existence of the power, it was an adoption of the agreement and a ratification of its execution on his behalf relating back to the date of the agreement, and was as effectual as if original authority to execute the agreement had been given. Herman on Estoppel, § 1081; Bradley v. Walker, 138 N. Y. 291, 298 [33 N. E. 1079]. The conveyance to Zabriskie and all subsequent conveyances of the land were made subject to the covenants and provisions of the restriction agreement. The effect of these conveyances was to charge the property in the hands of all subsequent owners including the defendant and estop them from denying its validity. "An owner may subject his lands to any servitude, and transmit them to others charged with the same; and one taking title to lands, with notice of any equity attached thereto, or any outstanding right or claim affecting the title or the use and enjoyment of the lands, takes subject to such equities and such right or claim, and stands in the place of his grantor, bound to do or forbear to do whatever he would have been bound to do or forbear to do. Lord Cottenham uses this language: 'If an equity is attached to property by the owner, no one purchasing, with notice of that equity, can stand in a different situation from the party from whom he purchased.' Tulk v. Moxhay, 2 Phil. 774." Trustees v. Lynch, 70 N. Y. 449, 26 Am. Rep. 615.

As to the Middle Road, I find that it is of the width of about 66 feet; that its location with reference to the property of the defendant is correctly shown on the Bridges' map; that its easterly line intersected the northerly line of Thirty-Fourth street at a point 79 feet 11 inches easterly from the corner formed by the intersection of the northerly line of Thirty-Fourth street with the easterly line of Madison avenue and intersected the north line of the defendant's property at a point 65 feet 6 inches easterly of the easterly line of Madison avenue measured along the dividing line between the defendant's property and the property of Mrs. Goodhue. This is not only the line shown on the Bridges' map, but is the easterly boundary line of the property conveyed by the city to Mary Murray by deed dated August 3, 1847, and harmonizes with the conveyance by the city to William B. Astor of the westerly half of the Middle Road by deed dated September 17, 1847, and is shown on the diagram attached to said deeds as the easterly line of the road.

It is also consistent with the conveyances by the city to Gilbert C. Willett by deed dated February 25, 1799, and the conveyance to John Thomson by deed dated March 16, 1799, and the surveys and diagrams attached to such deeds. These last-named deeds refer to a map of the common lands of the city filed in the clerk's office of the city and also to a particular survey annexed to the deeds. The particular survey attached to the deed to Willett contained a note as follows: "Surveyed July 10, 1795." And the survey attached to the deed to Thomson contained a similar note to the effect that it was surveyed August 25, 1794, each of which is signed "Casimir Th. Goerck, City Surveyor." While the map filed in the city clerk's office has not been produced by either party, it must be presumed that the particular survey attached to the deeds is a copy of the larger map of the common lands of the city so far as it relates to the property conveyed. It appears that as early as February, 1784, Mr. Goerck, the city surveyor, presented to the common council of the city a map of the common lands divided into lots. Upon said map what is called the "center road" was shown as 66 feet wide, but by a resolution of the common council was made 100 feet wide, and with that change the map was approved and a part of the lots ordered to be sold. On the map introduced in evidence by the defendant called the Goerck map the Middle Road, which I assume is the same as the center road, is stated to be 100 feet in width. There is no proof, however, that this map was ever filed in the clerk's office of the city, or that such a map if ever filed showed the Middle Road to be 100 feet in width. I attach very little weight to the maps introduced in evidence by the defendant by which it is claimed that the Middle Road was 100 feet wide. The Goerck map, which is the foundation of all the others, is not shown to have been the map of the common lands referred to in the deeds to Willett and Thomson, and it is produced not from the clerk's office, but from the comptroller's office of the city. It bears date March 1, 1796, which was nearly seven years after Willett purchased his property at auction, and a year later than the date of the particular surveys attached to the Willett and Thomson deeds. Willett purchased his lots at a sale had in June, 1789, and in reference to such sale the resolution of the common council provided that a map of the lands to be sold should be exhibited at the Coffee House for 10 days before sale for the examination of persons who might incline to be purchasers. Obviously a map dated in 1796 is not a copy of the map used at that sale. I must presume that the particular survey attached to the deed to Willett is a copy not of the map of 1796, but of the map exhibited at the Coffee House in June, 1789. The sale to Willett was reported to the common council by the committee having it in charge at a meeting held on June 24, 1789, together with "the articles to be executed by the corporation and the said purchaser agreeable to the order of this board of the 3rd of April last." This report was ratified by the common council on the date named. It thus appears that the sale to Willett was complete years before the date on the Goerck map produced by the defendant.

But, if the defendant's testimony raises a doubt as to the width of the Middle Road, the question is settled beyond dispute by the subsequent action of the parties. The property on both sides of the Middle Road was occupied by the grantees of the city. It is quite plain from the maps put in evidence by the defendant and from the testimony of Mr. Nostrand that, if the Middle Road was ever laid out and opened to the width of 100 feet, such width was not maintained. The road was encroached upon on both sides; and on the Randel map of 1820 and the Ludlam map of 1822 it is designated as about 66 feet in width. Such was the condition of the road when Madison avenue was opened and the Middle Road was discontinued, and conveyances were made by the city to Mary Murray of the easterly half and to William B. Astor of the westerly half thereof. In these conveyances the center line of the road was definitely fixed as being 46 feet 9½ inches easterly from the corner formed by the intersection of the easterly side of Madison avenue with the northerly side of Thirty-Fourth street, and the easterly side of the Middle Road where it intersected the northerly side of Thirty-Fourth street was definitely located at a point 33 feet 1½ inches easterly of the center line.

The titles of all subsequent purchasers rest upon these conveyances, and

for upwards of 60 years no one has questioned their validity. While there may be some doubt as to what the width of the Middle Road was as originally laid out, or what the city intended, there is none as to the intention or legal effects of the acts of the parties interested in the later conveyances. The city intended to divest itself of all title to the Middle Road, and to vest it in the adjacent owners. Unless it did this by the conveyances to Mary Murray and William B. Astor, the titles to the land on the easterly side of Madison avenue between Thirty-Fourth and Thirty-Fifth streets are defective. In my opinion there was by the acts and conveyances referred to a practical location by the parties interested in the easterly and westerly lines of the Middle Road, and necessarily of the westerly line of the land conveyed by the city to Willett in 1799. Baldwin v. Brown, 16 N. Y. 359; Sherman v. Kain, 86 N. Y. 57; Blackman v. Riley, 138 N. Y. 318, 34 N. E. 214. This practical location and settlement of the boundary line is conclusive upon the defendant, and estops her from maintaining anything to the contrary. Hennessy v. Murdock, 137 N. Y. 317, 33 N. E. 330.

It follows from these views that, unless the legal effect of the conveyance of Mary Murray to John R. Murray, dated November 11, 1851, was to extend the restriction to the center line of the Middle Road, that the part of the defendant's property subject to the restriction created by the agreement of February 22, 1847, is a lot in the rear of her property 20 feet 1 inch in width on Thirty-Fourth street and 34 feet 6 inches in width on the dividing line between the property of the defendant and the property of Mrs. Goodhue.

The counsel for Mr. Morgan and his associate plaintiffs earnestly contend that the conveyance from Mary Murray to John R. Murray, Jr., in 1851 carried the restriction to the center line of the Middle Road. It is argued that the parties to the partition action intended that lot 53 on the Bridges' map, which is the easterly half of the Middle Road between Thirty-Fourth and Thirty-Fifth streets, should be allotted to the owner of lot 54; and, as Mary Murray subsequently acquired title to lot 53 from the city by the application of the doctrine of estoppel, it became subject to the restriction agreement. The rule is well settled that, if a person purports to convey lands to which he has no title, his deed operates by way of estoppel, if he subsequently acquire title to the land purported to be conveyed. This rule, however, is not applicable to the present case. The restriction agreement does not purport to be made applicable to lot 53. It recites that the parties are "owners in fee simple" of divers lots and parcels of ground laid down on the Bridges' map; and it provides that they will not "erect or cause to be erected upon any of the lots owned by them respectively or any part of the same any building other than brick or stone dwelling houses, etc." None of the parties owned lot 53 in fee simple on February 22, 1847, and by the express terms of the agreement it was not made applicable thereto. It cannot be said, therefore, that the parties intended that the agreement should apply to lot 53. Neither do I think it can be said that the parties to the partition action intended that lot 53 should be a part of the land partitioned, nor do I find any evidence that they claimed title thereto. Lot 53 was not allotted by the commissioners in the partition action to any one. This allotment was made in 1841, and it was not until April, 1846, that the quitclaim deed of lot 53 was executed and delivered to Mary Murray by the other heirs of John Murray, in which it was recited that it was intended and supposed that the portion of the Post Road and the Middle Road had passed to the allottees of the adjoining lands. There is no recitation in that deed that the parties to the partition suit had title to the land within the road lines or claimed title thereto. The restriction agreement was executed more than 10 months after the execution of the deed referred to, and, if it was intended to be applicable to lot 53, some more appropriate language was necessary to accomplish that result than that used. It could not at that time be said that Mary Murray was the owner of lot 53 "in fee simple," nor is there any indication that the parties thought so. The language of the agreement precludes the idea that it was intended to apply to lot 53, and therefore there is no basis upon which the rule of estoppel can be applied.

None of the cases cited by the learned counsel are applicable to the facts of this case. In Lewis v. Gollner, 129 N. Y. 227 [29 N. E. 81, 26 Am. St. Rep.

516], the defendant agreed not to construct or erect any flats "in plaintiff's immediate neighborhood." Of this agreement the court said: "The phrase 'immediate neighborhood,' taken in connection with the subject-matter of the contract, is not so indefinite as to be incapable of just and natural boundaries, but, in any event, covers and includes the locality of the construction in progress." It was this contract that the court held attached·to the land when the defendant bought it, and that it was not essential that the obligation and ownership should be simultaneous to make the contract effective. Precisely the same rule was applied in National Bank v. Segur, 39 N. J. Law, 173. If Mary Murray had claimed to be the owner in fee simple of lot 53 when she executed the restriction agreement, or if that agreement had by its terms applied to lot 53, there would be ground for the application of the rule which the learned counsel invokes, but, as neither of these facts exist, the point cannot be sustained.

I therefore find that the part of the defendant's property which is subject to the restriction is a lot in the rear thereof 20 feet 1 inch wide on Thirty-Fourth street and 34 feet 6 inches wide on the north line of the defendant's property; and, such being the fact, the question is presented whether a court of equity should issue its injunction as prayed for in the complaint or whether equitable relief should be denied and the parties left to their legal remedy. In my opinion an injunction should not be granted. This case is distinguished from all the reported cases in the most important fact that the greater part of the property upon which the defendant is erecting the building is not subjected to the restriction. Only a little in excess of one-quarter of the area of the lot is subject to the restriction. Upon the balance of the property the defendant is entirely free to erect precisely the kind of building which has been erected over the whole property, and to permit it to be used for any lawful businesses except those specially mentioned in the restriction agreement. Assuming that Mrs. Goodhue desires to continue her residence upon her property, it is quite plain to me that she would suffer precisely the same annoyance and disturbance and inconvenience from the erection and occupation of a business building on that part of the defendant's lot which is free from the restriction as she would if such a building is extended over the whole lot. And, if a business building would affect the value of her property in any way, the effect would be the same whether the building is extended over the whole lot or confined to that part which is free from the restriction.

The defendant's legal right is to construct a building for business purposes which shall be 79 feet 11 inches on Thirty-Fourth street and 65 feet 6 inches deep adjoining Mrs. Goodhue's property; and for any inconvenience or discomfort that Mrs. Goodhue will suffer from such a building or from its use or for any loss arising from a depreciation in the value of her property which may be caused thereby she has no legal cause of complaint. The extension of such a building over the balance of the defendant's lot as is being done will not in my judgment add to the plaintiffs' annoyance or discomfort or damage in the slightest degree. An injunction therefore would be of no benefit to Mrs. Goodhue, and for a like reason it would not benefit the plaintiffs in the Morgan Case. It would, however, cause the defendant a serious loss. Up to the time when the electric road was constructed through Thirty-Fourth street, that street was lined on both sides with private residences of the highest character. From the time of the construction of the electric road, however, until the present, the character of the street has gradually changed, and it is now conceded by the plaintiffs that west of Madison and east of Lexington avenue—in other words, outside of the restricted territory—it has become a purely business street. Between Madison and Lexington avenues the buildings have maintained in their external appearance the character of private residences. But many of the old residents have moved away, and a considerable part of the property is used for business purposes. Many persons who own residences in that part of Thirty-Fourth street and continue to live in them are desirous of moving away and of selling their property for business purposes. Thirty-Fourth street has become a business thoroughfare within the restricted territory. It is not now a desirable place in which to live, and the property there is more valuable for

business than for residential purposes, and will produce a much larger rental if used for business than if used for residences. Madison avenue between Thirty-Fourth and Thirty-Fifth streets has also become an undesirable place to live. Altman's large store occupies the block on the east side of Fifth avenue between Thirty-Fourth and Thirty-Fifth streets, and extends east on Thirty-Fifth street to a point 100 feet west of Madison avenue. The delivery wagons from that store use Madison avenue to a considerable extent as a place to stand during a considerable portion of each day, and cause considerable disturbance and discomfort to the residents in the block referred to.

It is quite plain, I think, that the defendant cannot make a profitable use of her property on Thirty-Fourth street by devoting it to a residence. If she should now erect on the lot subject to the restriction a residence of the character intended by those who made that agreement, it could not be rented except for a sum which would be an inadequate return upon the value of the property, and not at all to a tenant of the financial ability or social standing of the majority of those who reside elsewhere on the restricted territory. An injunction would therefore cause the defendant a serious pecuniary loss, and prevent her from getting an adequate return from her property. An injunction therefore would be of no benefit to the plaintiffs and would impose great hardship on the defendant, and for these reasons an injunction should be denied. If the restriction covered the whole or the greater part of the defendant's property, I should reach a different conclusion. The encroachments of business in the surrounding territory would not be a sufficient reason for refusing to specifically enforce the agreement. The parties to the agreement must be presumed to have anticipated that that part of the city surrounding the restricted territory would ultimately be given up to business, although the time when that would happen may have seemed very remote in 1847. But it was plainly their intention to secure the restricted territory from the disturbance which business would necessarily produce when the city did grow up to the restricted territory. Obviously those who owned property on the outskirts of the restricted territory would not enjoy the benefits of such an agreement to so full an extent as those who reside further from the outskirts; but that fact would afford no legal excuse for the violation of the agreement.

In Trustees v. Thacher, 87 N. Y. 311, at page 319 [41 Am. Rep. 365], Judge Danforth said: "The general current of business affairs has reached and covered the entire premises fronting on Sixth avenue, both above and below the lot in question. If this was all, however, the plaintiffs would be justified in their claim, for it is apparent from the agreement that such encroachment was anticipated, and that the parties to it intended to secure the property in question from the disturbance which business would necessarily produce." And in Rowland v. Miller, 139 N. Y., at page 103 [34 N. E., at page 767 (22 L. R. A. 182)], Judge Earl said: "Here the plaintiff has the right to occupy her house as a residence, and in such occupation to have the protection of the restriction agreement." But, when it is clear that an injunction will be of no benefit to the plaintiff and will be a hardship to the defendant, the rule is settled that an injunction will be denied. In Trustees v. Thacher, at page 317, 87 N. Y. (41 Am. Rep. 365), the court said: "And so, though the contract was fair and just when made, the interference of the court should be denied, if subsequent events have made performance by the defendant so onerous, that its enforcement would impose great hardship upon him, and cause little or no benefit to the plaintiff." And in McClure v. Leaycraft, 183 N. Y. 36, Judge Vann, at page 41 [75 N. E. 961, at page 962] said: "A court of equity will not do an inequitable thing. It is not bound by the rigid rules of the common law, but is founded to do justice when the courts of law, with their less plastic remedies, are unable to afford the exact relief which the facts require. Its fundamental principle, as its name implies, is equity. It withholds its remedies if the result would be unjust, but freely grants them to prevent injustice when the other courts are helpless. It cannot set aside a binding contract, but, when the effect would be inadequate owing to facts arising after the date of the agreement and not within the contemplation of the parties at the time it was made, it refuses to enforce the contract and

remands the party complaining to his remedy at law through the recovery of damages."

For the reasons I have stated, I am of the opinion that plaintiffs will suffer the same disturbance, annoyance, and discomfort, and their property would be affected in precisely the same way and to the same extent from the erection by the defendant of a building which would be within the exercise of her legal rights, as they will from the building complained of. An injunction would therefore not benefit them, and it would be a great hardship to the defendant, in view of the changed character of Thirty-Fourth street. Consequently equitable relief will be denied. The complaint in each case is dismissed, but, as the defendant is violating the agreement, the dismissal is without costs. It will also be without prejudice to the maintenance of an action at law for breach of the agreement.

Requests to find may be submitted to me by either party within 20 days.

Argued before INGRAHAM, P. J., and McLAUGHLIN, MILLER, LAUGHLIN, and DOWLING, JJ.

John G. Milburn, for plaintiff.
Peter B. Olney, for defendant.

INGRAHAM, P. J. We agree with the referee in his opinion and in the conclusion which has resulted in the dismissal of the complaint. The clear intention of the parties to the instrument to enforce which this action was brought was to regulate the character of the buildings to be erected upon the premises, and also to restrict the use to which any buildings thereon erected could be thereafter applied. Thus it was provided that there should not be erected on any of the lots owned by the parties respectively, or any part of same, any building or erection other than brick or stone dwelling houses of at least two stories in height, except churches and stables of brick or stone, for private dwellings. In addition to this general covenant providing for the nature of the buildings to be erected upon the property owned by the parties thereto, it was further agreed that the parties would not thereafter erect or permit upon such lots or any part of the same any of the occupations specified or any other use of the property known as nuisances in law. One was a covenant which applied to the character of the buildings to be erected on the property; the other a covenant which applied to the erection or use of a building erected upon the premises. It would seem that the latter covenant was not violated by the erection of the building that the defendant contemplated when the action was brought, but there was clearly an intended violation of the covenant restricting the nature of the building which should therefore be erected upon the premises subject to the covenant. Kitching v. Brown, 180 N. Y. 414, 73 N. E. 241, 70 L. R. A. 742; Clark v. Jammes, 87 Hun, 215, 33 N. Y. Supp. 1020.

When this agreement was executed, the parties must have contemplated that the portions of the restricted area which abutted on other property not restricted would be affected by the erection of buildings or a use of the property of a character other than that to which the restricted property was confined, but, notwithstanding this fact, the restriction was absolute and as much affected property which

127 N.Y.S.—9

adjoined unrestricted property as the other property within the restricted area. The fact that the use of the portions of the property adjoining unrestricted property would be affected by the use of such adjoining property would not justify the owners of the property restricted in violating the covenants which were to control all the property included within the area restricted. I am not prepared to assent to the proposition that the fact that a larger price could be obtained for the use of the property within the restricted area if the restriction was disregarded, or that the price for which such outlying property could be disposed of would be increased if the restriction was removed is a justification for a breach of this covenant. If a use of any of the property covered by the restrictive agreement would be justified, it would be but a short time when the covenant as affecting the whole property could be safely violated. The parties who have purchased property within the restricted area subject to the restrictions contained in this instrument have acquired it subject to a restriction which insures it being maintained as residential property, and this a court of equity should enforce, where it appears that in consequence of the proposed violation of the restrictive covenant the use of adjacent property for residential purposes is directly affected. The justification for the refusal to enforce this covenant in this action is that the referee has found, and the evidence sustains the finding, that the use of the rear of the plaintiff's lots does not at all affect the use of the plaintiff's property as a residence. Plaintiff's property is affected by the erection of the structure upon the portion of the defendant's property which is not restricted, but it seems clear that the fact that the defendant's building has been extended back to the rear of her lots could not at all affect the use of the plaintiff's property as a residence, while it would seriously injure the use by the defendant of her property to enjoin the use of the rear of her lots.

These facts appearing, I think a court of equity was justified in refusing to enforce the covenant, leaving the parties to an action at law, if at any time it would appear that the violation of the covenant by the defendant on the rear of the lots did as a fact cause a serious injury to the plaintiff's property.

The other questions involved have been fully considered in the referee's opinion, which we adopt, and for the reasons stated by him the complaint was properly dismissed.

It follows that the judgment should be affirmed on the opinion of the referee, but, as both parties have appealed, without costs.

LAUGHLIN, MILLER, and DOWLING, JJ., concur.

McLAUGHLIN, J. I vote for affirmance on the opinion of the referee.