But the power of the state depends on the exercise of the privilege or franchise to do business within the state in a corporate or organized capacity, not on the exercise of the privilege to do interstate business, which Congress alone can grant and regulate. The underlying principle, if I have discerned it, is that the corporation statutes of this state become operative upon foreign corporations only perforce of some privilege which the state has the power to grant or withhold. Those statutes, construed in the light of that principle, form a consistent scheme in harmony with the federal Constitution. I shall not hazard a general definition of what constitutes the exercise of a corporate franchise within this state. It is sufficient for this case to state a rule of exclusion, i. e., that the mere employment in this state of means and agencies as incident to the conduct in another state of an interstate business does not constitute the "doing" or the "transaction" of business or "the exercise of a corporate franchise" in the state within the meaning of its statutes.

The determination of the Appellate Term should be reversed, and the judgment of the Municipal Court affirmed, with costs.

SCOTT, J., concurs.

---

(147 App. Div. 892.)

### HOVEY v. RICHARDSON.

(Supreme Court, Appellate Division, First Department. December 29, 1911.)

Appeal from Appellate Term.

Action by Le Roy F. Hovey against Thomas D. Richardson, Jr. From a determination of the Appellate Term reversing a judgment of the Municipal Court for defendant, he, by permission, appeals. Determination of Appellate Term affirmed.

Argued before INGRAHAM, P. J., and LAUGHLIN, CLARKE, SCOTT, and MILLER, JJ.

Charles E. Rushmore, for appellant.
L. S. Kafer, for respondent.

PER CURIAM. For the reasons stated in the prevailing opinion herewith handed down in Hovey v. De Long Hook & Eye Company, 133 N. Y. Supp. 25, the determination of the Appellate Term should be affirmed, with costs.

MILLER and SCOTT, JJ., dissenting.

---

(148 App. Div. 307.)

### WILSON et al. v. FORD et al.

(Supreme Court, Appellate Division, First Department. December 15, 1911.)

1. ACTION (§ 38*)—JOINDER OF CAUSES OF ACTION.

Code Civ. Proc. § 484, provides that plaintiff may unite in the same complaint two or more causes of action to recover for injuries to real property, if it appears upon the face of the complaint that all the causes of action so united are consistent with each other. Plaintiffs who had an easement in an alleyway, and owned two undivided third parts of it, sued to enjoin defendants' use of the alley, or, failing in that, to restrain its use for business purposes; the two grounds for relief arising out of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the transactions connected with the same subject of action. *Held*, that plaintiffs were not seeking two distinct and inconsistent kinds of relief, since whether one or both of the causes of actions were sustained would only affect the degree of relief.

[Ed. Note.—For other cases, see Action, Cent. Dig. § 549; Dec. Dig. § 38.*]

2. EASEMENTS (§ 61*)—ACTION FOR INJUNCTION—STATUTORY PROVISIONS.

An action to enjoin the use of an alleyway, or, failing in that, to restrain its use for business purposes, is not an action, under Code Civ. Proc. §§ 1638, 1639, relating to actions to determine a claim to real property or any interest therein, including any claim in the nature of an easement, but is to enjoin a trespass, and hence the complaint need not conform to those sections.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 135, 141; Dec. Dig. § 61.*]

3. EASEMENTS (§ 61*)—ACTION—INJUNCTION.

Owners of the servient estate may sue to restrain an unauthorized servitude, and owners of an easement may sue to enjoin a use thereof interfering with their rights.

[Ed. Note.—For other cases, see Easements, Cent. Dig. § 139; Dec. Dig. § 61.*]

4. EASEMENTS (§ 42*)—CREATION—EXPRESS GRANT.

Where the full use, authorized or created by an express grant, is not imposed in the beginning, it may be increased until the entire measure of the grant is enjoyed; but the right to the full use must exist ab initio. The owner of a right of way over the land of another is limited in its use to the terms of the grant from which the way is derived.

[Ed. Note.—For other cases, see Easements, Cent. Dig. § 97; Dec. Dig. § 42.*]

5. EASEMENTS (§ 42*)—EXPRESS GRANT—CONSTRUCTION—INTENT.

An agreement between owners of property, creating an alley with certain easements of way therein, is to be given such construction as will effect the intention of the parties when the agreement was entered into; and where the intent clearly appears from the language of the agreement, extraneous matter will not be considered; but, if the intent is not clear, the court will look to the circumstances under which it was made.

[Ed. Note.—For other cases, see Easements, Cent. Dig. § 97; Dec. Dig. § 42.*]

6. EASEMENTS (§ 44*)—EXPRESS GRANT—UNRESTRICTED EASEMENT—WORDS OF CONVEYANCE.

A statement that a way is "for ingress and egress," or for "the purpose of passing and repassing," aptly describes an easement of way without restriction.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 98–100; Dec. Dig. § 44.*]

7. EASEMENTS (§ 44*)—EXPRESS GRANT—CONSTRUCTION—LIMITATION OF EASEMENT.

The owners of three adjoining lots in a residence district, occupied as residences, and who were the equal owners and tenants in common of a lot in the rear of their residences, known as lot No. 5, in 1864 executed an agreement reciting their respective titles, and providing that each of them, their heirs and assigns, "shall forever hereafter have and enjoy the use in common, exclusive of all other persons, of said lot No. 5, as a passageway for themselves, their servants or other deputy, either on foot or with horses, carriages, or otherwise, to and from their respective lots aforesaid, and to and from the stables built and to be built for private use on their said respective lots," and the way was used in connection with private stables located on two of the lots. *Held,*

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that the language of the agreement justified and required the aid of surrounding circumstances and conditions in ascertaining the true intent of the parties, and that in view of the surrounding circumstances the alley as originally created was nothing more than a way to private residences and stables, and did not authorize its use in connection with a 12–story business building subsequently erected on one of the lots.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 98–100; Dec. Dig. § 44.*]

8. EASEMENTS (§ 44*)—EASEMENTS APPURTENANT—EXTENT—TRANSFER.

The several owners of lots 1, 2, and 3 also owned in common lot 5, which extended across the rear of the others, and made a written agreement that lot 5 should be an alley appurtenant to their lots. A subsequent owner of lot 3 and an undivided third of the fee in the alley, with the appurtenant easement, and who also owned lot 7, on the other side of the alley, but which had no easement therein, conveyed lot No. 7 and the undivided one-third of the alley by deed, intending to convey all the rights, privileges, and immunities shown by the agreement creating the alley and the appurtenant easements therein, but reserving to himself the right of using the alley in the manner provided by the alley agreement. *Held*, that the grantor's attempt to extend the easement to a lot to which it was not originally appurtenant was ineffectual.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 98–100; Dec. Dig. § 44.*]

9. EASEMENTS (§ 3*)—GRANT—RESERVATION—CONSTRUCTION.

The deed so given by the owner of lot 3 and lot 7 reserved, "however, to the said party of the first part the right of using said alley in the manner provided" in the alley agreement, "except as hereinbefore reserved." *Held*, that it was the grantor's intention to reserve an easement to himself for life, and that the grantee took the fee in the alley freed from the easement as appurtenant to lot No. 3, and the easement reserved to the grantor was in gross.

[Ed. Note.—For other cases, see Easements, Cent. Dig. §§ 8–12; Dec. Dig. § 3.*]

10. EASEMENTS (§ 42*)—EXPRESS GRANT—CONSTRUCTION.

An express grant of an easement must be construed most strongly against the grantor.

[Ed. Note.—For other cases, see Easements, Cent. Dig. § 97; Dec. Dig. § 42.*]

11. EASEMENTS (§ 14*)—CREATION—RESERVATION OR EXCEPTION—WORDS OF INHERITANCE.

A reservation or exception of an easement need not contain words of inheritance in order to retain the excepted interest to the grantor and his heirs, as words of reservation may create an exception, according to the nature of the thing reserved and the intent of the parties.

[Ed. Note.—For other cases, see Easements, Cent. Dig. § 40; Dec. Dig. § 14.*]

12. ESTOPPEL (§ 22*)—GROUND OF ESTOPPEL—RECITALS IN DEEDS.

Where an owner conveyed a lot and a third of the fee in a rear alley, in which he had a right of way, reserving to himself, without words of inheritance, the right of using such alley as before enjoyed, recitals in subsequent deeds, describing the reservation as being to such grantor and "his heirs and assigns," are merely descriptive of the grantor's deed, which speaks for itself, and do not estop subsequent grantees from asserting that the reservation was not made as recited.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 27–51; Dec. Dig. § 22.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

13. ESTOPPEL (§ 25*)—DEED—PARTIES AND PRIVIES.
   An estoppel by deed can only arise in favor of the parties and privies to that deed.
   [Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 61, 62; Dec. Dig. § 25.*]

14. EASEMENTS (§ 61*)—ACTION FOR INJUNCTION—USE ILLEGAL IN PART.
   Where plaintiff, in an action to enjoin the defendants' use of a right of way, shows that a part of the user is illegal, the entire use will be perpetually enjoined, where the legal user, if any, cannot be separated from the illegal user.
   [Ed. Note.—For other cases, see Easements, Cent. Dig. § 135; Dec. Dig. § 61.*]

Action by Marshall Orme Wilson and Richard T. Wilson, Jr., individually and as executors and trustees of Richard T. Wilson, deceased, and others, against James B. Ford and others. Judgment for plaintiffs, and defendants appeal. Affirmed.

The following is the referee's opinion, referred to by the court:

This is an action to restrain the defendants from making any use of a certain alleyway, or, failing in that, to restrain its use for business purposes. The facts material to this controversy are best set out in connection with the following diagram:

The present plaintiffs, as successors to the title of Robert T. Wilson, the original plaintiff, are the owners in fee simple of lot No. 1, lot No. 7, lot No. 6, and two equal undivided third parts of lot No. 5, which is an alley. The defendants are the owners and lessees of lot No. 3. All these lots were part of premises formerly owned by Margaret Burr, Mary Burr, and Sarah Burr as tenants in common, and were, by two agreements between the owners, placed under perpetual restrictions excluding business buildings. One, executed in 1861, covered all the lots except lot No. 3. In this agreement the parties covenanted for themselves, their heirs, and assigns not to "erect on any of the aforesaid lots of land or any part thereof any buildings other than dwelling houses at least two stories high of brick or stone, with the ordinary

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

yard appurtenances to dwelling houses, including stables for private use, or churches of the same material." It provided that all purchasers, lessees, and occupants of any of the lots should be required to come under and be bound by the restriction which should run with the land. The other agreement, covering, among other land, lot No. 3, was entered into in 1857, and imposed substantially the same restriction. While private stables were not specifically mentioned, "ordinary yard appurtenances" were authorized. It also provided that the restriction should be binding on all purchasers, lessees, and occupants, and should run with the land. These several restrictions were observed by the successive owners of the lots until a comparatively recent time. The residence on lot No. 3 was occupied as such until 1901, when it was leased to tenants who occupied it for business purposes until 1907. The residence was then replaced by a 12-story business and office building. The residence building on lot No. 2 still stands, but for several years past has been devoted to business. Lots Nos. 1 and 7, owned by the plaintiffs, are still occupied by private residences. On the rear part of lot No. 1, and next to the alley, there is a private stable used in connection with the residence on that lot. On lot No. 4 there is a structure formerly used as a stable in connection with lot No. 2, but which, for several years past, has been used for business purposes. Lot No. 3 has never had a stable on it.

In 1906 the then owner of the premises now owned by the plaintiffs joined in an agreement releasing from the Burr restriction of 1861 the various properties which it covered. The plaintiffs and their predecessors in title have not, however, consented to the use of the alley in connection with business establishments. Protests were made against the use of the alley for the purposes of the business conducted in the residential building on lot No. 3 and against the use of the alley in connection with the erection and occupancy of the present business building. The present lessees have continued to use the alley for carting goods to the building and for removing ashes therefrom, thus very materially increasing the servitude on the alley. The rights in the alley are defined by an agreement made in 1864. Peter H. Morss was the owner of lot No. 1, Thomas T. Sturges of lots Nos. 2 and 4, and James S. Sturges of lot No. 3, while the three were equal owners and tenants in common of lot No. 5. They executed an agreement, under date of January 2, 1864, reciting their respective titles, and providing that each of them, their heirs and assigns, "shall forever hereafter have and enjoy the use in common, exclusive of all other persons, of said lot No. 5, as a passageway for themselves, their servants or other deputy, either on foot or with horses, carriages, or otherwise, to and from their respective lots aforesaid, and to and from the stables built and to be built for private use on their said respective lots." In consideration of this agreement, the parties mutually covenanted and agreed, for themselves and their respective heirs and assigns, that they "will each bear, pay, and discharge his equal proportion of all taxes, assessments, and expenses attending the use of said lot No. 5 or chargeable thereon."

On August 11, 1868, James S. Sturges conveyed lot No. 3 and his equal undivided third part of lot No. 5 to John R. Ford, and on the same day, by separate deed, also conveyed to Ford lot No. 7. Lot No. 7, abutting on the easterly side of the alley, had no easement therein. Ford, however acquired an easement under the deed conveying lot No. 3 and the undivided interest in the alley. Ford by deed dated February 26, 1879, conveyed to the trustees of the estate of Augustus Embury lot No. 7, together with the undivided third part of the alley, with the following reservation: "Reserving, however, to the said *party of the first part* the right of using said alley in the manner provided in agreement recorded in Liber 916 of Conveyances, page 82; it being the intention of the parties of the first part hereto to convey to the parties of the second part hereto all the rights, privileges, and immunities contained in an agreement recorded in Liber 916 of Conveyances, page 82, except as hereinbefore reserved." The agreement referred to is that creating the alley. Thereafter, as a result of a partition suit, lot No. 7, and the undivided third part of the alley, as conveyed by John E. Ellison and conveyed to him by referee's deed. Ellison in 1897 conveyed the same premises to Richard T. Wilson by deed, which referred to the deed of John R. Ford

in 1879 as "reserving to the said John R. Ford, *his heirs and assigns*, the right of using the alley." Subsequent deeds conveying the same premises have also referred to the Ford deed as reserving to Ford's heirs and assigns the alley easement. Ford died in 1897, leaving a will whereby he devised lot No. 3 to the defendants James B. Ford, John Howard Ford, and James B. Ford as trustee.

It is to be noted that, after the deed by Ford in 1897 conveying lot No. 7 and the undivided third of the alley, no owner of lot No. 3 has held any interest in the fee of said alley, and the taxes on the alley lot and the cost of maintaining it as a way have since been paid by the plaintiffs and their predecessors in title, and by the owners of lot No. 2. The plaintiffs now contend that the defendants, as owners and lessees of lot No. 3, have no rights in the alley whatsoever, or at best only a qualified right, which they are exceeding. The defendants, on the other hand, claim that they have, as appurtenant to their lot, an unlimited easement in the alley and the right to use it for any lawful purpose in going to and from their building.

[1] Preliminarily, the defendants object, first that the complaint has joined two inconsistent causes of action, in violation of section 484 of the Code of Civil Procedure; and, secondly, that the complaint fails to state a cause of action under sections 1638 and 1639 of the Code of Civil Procedure. The point of the first objection is that the complaint sets forth a cause of action asserting that the defendants have no easement whatever in the alley and another cause of action asserting that they have an easement only for a limited use which they are violating. Inconsistency is claimed, because one cause of action can be sustained only by showing that the defendants have no easement, while the other, presupposing an easement, can be sustained only on that theory. The inconsistency, in my opinion, however, is not real. It is conceded that the two causes arise out of transactions connected with the same subject of action. The plaintiffs, having an easement in the alley and owning two undivided third parts of the servient estate, are suing to enjoin an illegal use of the alley in the nature of a continuing trespass. Under the complaint, the use made of the alley by the defendants may be wholly illegal, or only partly so, according as it is found that they have no rights in the alley, or only a limited right. In either event, there would be an unauthorized use of the alley, entitling the plaintiffs to injunctive relief, and, whether one or the other, or both, of the causes of actions be sustained, only goes to affect the degree of relief to be granted. The plaintiffs are not seeking two distinct and inconsistent kinds of relief, as was the case in the decisions cited in support of the defendants' contention.

[2] As to the second objection, it is sufficient to point out that this action is not brought under sections 1638 and 1639 of the Code, and that the complaint need not, therefore, conform to those sections. The action is not one to try title to real estate, but to enjoin a trespass.

[3] The plaintiffs, as owners of the servient estate, may maintain an action for an injunction to restrain an unauthorized servitude (McCullough v. Broad Exchange Co., 101 App. Div. 566, 92 N. Y. Supp. 533, affirmed on opinion below, 184 N. Y. 592, 77 N. E. 1191), and as owners of an easement they may sue to enjoin a use thereof interfering with their rights (Alexander Smith, etc., Carpet Co. v. Ball, 143 App. Div. 83, 127 N. Y. Supp. 974). The portion of the plaintiffs' prayer for relief, that the court adjudged that only the plaintiffs and the owners of lots Nos. 2 and 4 have an easement in the alley, may be treated as surplusage. The adjudication of the rights of the parties to the easement is only incidental to the determination of the question whether or not the cause of action for injunctive relief exists.

The main issue of the case is the right of the defendants to use the alley as a passageway to and from the business building now standing on lot No. 3. Two questions are presented: First, whether the agreement between Peter H. Morss, Thomas T. Sturges, and James S. Sturges, establishing the alley as a way to their respective premises, so limited the use of the alley that the present use in connection with lot No. 3 is unauthorized and illegal; and, secondly, whether the conveyance by John R. Ford of lot No. 7, and his undivided third of the interest in the alley has extinguished the right and easement in the alley appurtenant to lot No. 3.

[4] 1. The alleyway agreement made in 1864, after reciting the several owner-ships, provided that the parties "shall forever hereafter have and enjoy the use in common, exclusive of all other persons, of said lot No. 5 as a passage-way for themselves, their servants or other deputy, either on foot or with horses, carriages, or otherwise, to and from their respective lots aforesaid, and to and from the stables built and to be built for private use on their said respective lots." In this agreement each of the parties grants to others an easement for passage in lot No. 5. They could have created an unlimited easement or an easement for special purposes. The question is, What did they do? One thing would appear incontrovertible: That by this agreement the use sanctioned by the easement became definitely fixed at once and for all time. Additional rights in the alley could be conferred by a new agree-ment between the owners of the dominant estates; and doubtless, if the entire fee of the alley should vest in one owner, he might use it in a manner not authorized by the agreement, provided he did not unduly interfere with the right of easement in others. Such user would be solely by virtue of the owner-ship of the fee. But I know of no legal theory under which the use of an easement created by grant can be said to expand with the changing condi-tions of the dominant estate. If the full servitude authorized by the grant is not imposed in the beginning, the servitude may be increased until the entire measure of the grant is enjoyed; but the right to impose such addition-al servitude must exist ab initio. The owner of a right of way over the land of another is limited in its use to the terms of the grant from which the way is derived. Wells v. Tolman, 156 N. Y. 636, 51 N. E. 271. As was said by Judge Parker, in Meyers v. Baker, 45 App. Div. 29, 60 N. Y. Supp. 799: "The owner of the servient estate has the right to insist that the easement enjoyed shall remain substantially as it was at the time it accrued, regardless of whether benefit or damage will result from a proposed change." And in Woolich on Ways. p. 12, the rule is declared to be that "a man cannot use his right of way beyond the terms of his original grant."

So in the case at bar, if the alley agreement created a way to the lots of the parties without limitation as to the manner of its enjoyment, the fact that the way was then and for long afterwards used only in connection with private residences and stables would present no obstacle to the increased ser-vitude placed upon it by its user in connection with the business building now on lot No. 3. Such a servitude would have been authorized from the date of the agreement, though the occasion for imposing it arose only in recent years from the changed condition of the dominant estate. On the other hand, if the servitude on the alley was limited to a use in connection with resi-dences and private stables, no change in the condition of the abutting lots could warrant a different servitude. In short, if the use now being made of the alley by these defendants would not have been authorized the day after the alley agreement was executed, such use is now excessive and illegal. It is beyond the terms of the grant. No decision cited by the defendants con-flicts with this view. In Arnold v. Fee, 148 N. Y. 214, 42 N. E. 588, and Gillespie v. Weinberg, 148 N. Y. 238, 42 N. E. 676, the original grant of the easement was without restriction, and was held to be broad enough to author-ize the changed use to which the servient estate was put. It becomes un-necessary to consider, therefore, any change of neighborhood from a resi-dential to a business district which may have taken place in the vicinity of this property, or the agreement referred to in the statement of facts, where-by the so-called Burr restrictions on these lots were abrogated. The nature of the easement must be determined solely by the agreement creating it, read in the light of surrounding circumstances where necessary to illumine intent.

[5] The correct construction of this agreement, as of any other contract, is that which will give effect to the intention of the parties at the time the agreement was entered into. If the intent clearly appears from the language of the instrument, extraneous matter will not be considered; but if the in-tent is not clear the court will look to the circumstances under which the agreement was made. As was observed by Justice Werner, writing for the Court of Appeals in Kitching v. Brown, 180 N. Y. 420, 73 N. E. 242, 70 L. R. A. 742: "One of the familiar rules applicable to the interpretation of am-biguous covenants and agreements is to ascertain, as nearly as may be, the

situation of the parties, their surroundings and circumstances, the occasion and apparent object of their stipulations, and from all these sources to gather the meaning and intent of their language." And in Blackman v. Striker, 142 N. Y. 555, 37 N. E. 484, the court said: "The primary rule of construction applicable to a clause in a deed in the form of an exception or reservation is to gather the intention of the parties from the words, by reading not simply a single clause, but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered."

This rule applies with peculiar force in determining the proper uses of an easement. In the case of Alexander Smith, etc., Carpet Co. v. Ball, just reported (143 App. Div. 83, 127 N. Y. Supp. 974), the Appellate Division, Second Department, said: "It is perfectly good law, no doubt, that where a grant of a right of way is made by deed, the extent of the right is to be determined, not by user, but by the terms of the grant. But the terms of the grant are to be determined by the ordinary rules governing the construction of contracts and statutes. We are to read the whole contract in the light of the conditions surrounding its making." The Massachusetts Supreme Judicial Court, in the recent case of Lipsky v. Heller, 199 Mass. 310, 85 N. E. 453, laid down the rule that the character of an easement for passage must be ascertained from the purpose and intention of the grantor rather than from any particular form of words used. [6, 7] In the case at bar the alley was created for the exclusive use of the parties "as a passageway for themselves, their servants or other deputy, either on foot or with horses, carriages, or otherwise, to and from their respective lots * * * and the stables built and to be built for private use on their respective lots." A mere reading of this language carries the conviction that the parties did not thereby intend to create a way to their lots without limitation as to its use. It is not difficult to describe an unlimited easement. A mere statement that a way is "for ingress and egress," as in Arnold v. Fee, 148 N. Y. 214, 42 N. E. 588, or for "the purpose of passing and repassing," as in Gillespie v. Weinberg, 148 N. Y. 238, 42 N. E. 676, aptly describes an easement of way without restriction. When therefore, the parties go further, and attempt to set out the particular uses to which a way may be put, this fact in itself imports that some limitation is intended. One plain limitation of the use is to *private* stables. The phrase "exclusive of all other persons," considered in connection with the language following it, may fairly be construed to exclude the numerous tenants of an office building. There are other terms evidently designed to limit the use which require construction. One of these is the word "servants." Does it mean household servants, or the operatives in a factory, or both? Another is the word "deputy"—a term of obscure significance. Does it mean persons coming on the premises on some mission with the occupants of private dwellings, such as grocers, milkmen, and the like, or persons carting goods to a mercantile establishment? The reference to private stables, which would naturally be used as adjuncts to private residences sheds some light on the meaning of these terms; but the language of the agreement, in my opinion, is such as to justify and require that the condition of these properties at the time of the agreement be considered with the view of ascertaining the true intent of the parties as to the uses to be made of the way they created.

Looking, then, to the surrounding circumstances, the meaning of the agreement becomes plain. This agreement, it will be remembered, was made in the year 1864. The neighborhood was then strictly residential. Moreover, the Burr restriction of 1861, prohibiting business buildings, was in effect as to all the lots except lot No. 3, and that was subject to a similar restriction, made in 1857. At this early date it could hardly have entered into the contemplation of the parties that such restrictions might not be perpetually binding. Deeds to portions of the property, executed long after the alley was created, were made subject to these restrictions; and the question of the abrogation of similar restrictions by a change of neighborhood has since that date been sharply contested in the courts. The parties had residences on their lots. They evidently had the Burr restrictions in view when they created the alley, and the intended use of the alley was in connection with

private residences and stables. The language of their agreement is entirely apt for this purpose, and for this purpose only. The reference to "stables built and to be built *for private use*" is very similar to the language of the Burr restriction, and was evidently designed to make the uses of the alley coextensive with the restricted uses of the dominant tenements. When the then existing conditions are considered, it seems clear that the parties did not contemplate or intend that the alley should be used as a way to a large business building of the character the defendants now maintain upon their lot.

The decided cases are to the effect that a grant or reservation of a way, if not unrestricted in its terms, will create only the limited easement intended by the parties, and that this will not be extended to different uses by the changed character of the dominant estate. The alley here is not an unrestricted way, and if held to be a way to lots *occupied by private residences and stables*, which seems to be in accord with the intent of the parties, the case of Norris v. Hoffman, 133 App. Div. 596, 118 N. Y. Supp. 156, *affirmed on opinion below* 197 N. Y. 578, 91 N. E. 1118, becomes a persuasive authority. In that case the way was reserved "to the stables" in the rear of three lots, which were then occupied by private dwellings. The plaintiffs, who owned one lot over which the way passed to the other lots, sought to have the way declared abandoned and their lot freed from the servitude. The stables on the other two lots had lost the benefit of the easement and a large apartment hotel had been erected in place of the residences formerly occupying them. The court said: "In the case now before us, when the easement was created, the three lots involved were occupied by their respective owners for private dwellings, and it seems to me perfectly obvious from the language used in the grant that it was intended, and the complaint so alleges, that the carriageway should be used only for the benefit of such owners as a carriageway to the private stables in the rear of their residences and while they so occupied them. When these dwellings were torn down, and the defendants erected in their place a large apartment hotel, they thereupon extinguished whatever easement they had theretofore in the carriageway, because such act was inconsistent with the terms of the reservation. The circumstances under which it was reserved and the necessity for its use no longer exist. Instead of the two private dwellings occupied by their respective owners, lots 106 and 108 are occupied *by many people in separate apartments, such as could not have been within the contemplation of the common grantor.* * * * The facts alleged in the complaint, which are admitted by the demurrer, not only show that the legitimate use of the easement has been rendered impossible by the erection of the apartment house, but also that the easement has been abandoned."

In Allan v. Gomme, 11 Ad. & El. 759, it appeared that a right of way and passage had been granted to a "stable and loft over the same, and the space and opening under the said loft, * * * used as a woodhouse." The grantee of the way subsequently converted this loft and space used as a woodhouse into a cottage, for the purposes of which he began to use the way. The court held that the reference to the woodhouse was merely to indicate the terminus of the way, but that it could not be used for any purpose, and had to be confined to a use in connection with the land in the same condition as at the time of the grant. Denman, C. J., argued by way of illustration that a way to a field of many acres in pasture or corn could not be used to the field after it was built up into a village. Mr. Washburn, in his work, on Easements and Servitudes, Fourth Edition, in discussing this case said: "In Heming v. Burnett, 8 Exch. 187, the extent to which the doctrine in Allan v. Gomme might lead, from the terms there employed, is somewhat modified, though its general doctrine that reference is to be had to the existing state of things at the time the grant is made, in construing its terms and meaning in respect to the nature and extent of the easements that pass with it, is not impugned." Page 290.

I fail to perceive a distinction in principles between a way granted to a building described as used for specified purposes and a way to premises which in the contemplation of the parties could be occupied only for a certain purpose, and am of the opinion that the alley as originally created was nothing

more than a way to private residences and stables and must be limited to that use. The burdensome nature of the servitude imposed on the way by a modern many-storied business building, with its multitude of tenants, is apparent. A slight and inconsequential use may by it be converted into a continuous and onerous one. When the right to such a servitude is asserted, there should be clear warrant for it in the agreement creating the easement. This I fail to find.

The cases cited by the defendants are not opposed to this conclusion. Arnold v. Fee, 148 N. Y. 214, 42 N. E. 588, and Gillespie v. Weinberg, 148 N. Y. 238, 42 N. E. 676, were cases in which an unlimited and unrestricted way was created. Dand v. Kingscote, 6 Mees. & W. 174, simply holds that where a way is reserved for a specified purpose—that of removing coal from a colliery—an improved method of carriage not known at the time of the reservation may be employed; the court observing that: "There is no doubt that the object of the reservation is to get the coals beneficially to the owner of them." United Land Co. v. Great Eastern R. Co., 17 L. R. Eq. 158, was not, as the Vice Chancellor pointed out in his opinion, a case of an easement over a servient tenement. There the ways in question were grade crossings, or communications which the railway company, in taking land compulsorily, had, pursuant to contract, constructed between the portions of the estate severed by its road. In holding that these ways were not restricted to agricultural uses because of a statute in force at the time they were established prohibiting buildings upon the adjacent lands, but could, upon removal of the prohibition, be used for all purposes connected with buildings subsequently erected on the land, the court bases its conclusion upon several considerations: First, that an act of Parliament restricting the powers of the railroad in taking private property requires that communications shall be made "such as shall, in the judgment of the commissioners for the time being, be necessary for the convenient enjoyment and occupation of the lands of her majesty"; further, that the damages caused by the severance of the land were estimated upon the basis of sufficient crossings and communications between the severed premises; and, finally, the fact that the ways were 30 feet and 20 feet in width was considered important, as showing that the parties did not contemplate that the ways were to be used only for agricultural purposes. The Vice Chancellor said: "For the largest wagon used on a farm no such width would be required, and these dimensions would be utterly useless, unless the parties contemplated that the land might at some future period be used for building purposes."

2. There remains to be considered the effect of the deed made by John R. Ford to the trustee of the estate of Augustus Embury in 1879, conveying lot No. 7 and the undivided one-third of the alley. It is convenient once more to set out in full the reservation in the deed: "Reserving, however, to the said party of the first part the right of using said alley in the manner provided in agreement recorded in Liber 916 of Conveyances, page 82; it being the intention of the parties of the first part hereto to convey to the parties of the second part hereto all the rights, privileges and immunities contained in an agreement recorded in Liber 916 of Conveyances, page 82, except as hereinbefore reserved." The agreement referred to is that creating the alley.

[8] Ford was prior to this conveyance the owner of lot No. 3 and had in the alley an easement appurtenant to that lot. He had two distinct interests in the alley—one the easement, and the other the undivided one-third of the fee. Precisely the same interests were vested in the owners of lots Nos. 1 and 2. The situation of the parties was the same as when the alleyway was first established. Ford now conveys his undivided one-third of the servient estate of the alley along with lot No. 7, which abuts on the alley but has no easement therein, and thereby severs from lot No. 3 the interest in the alley from which its easement was originally derived. By an appropriate conveyance he could have effected this severance without surrender of the easement appurtenant and its conversion into an easement in gross. This in my opinion he failed to do. To me it is clear from the terms of the reservation that he believed that his interest in the fee had inherent in it a right of easement over the alley, and that by conveying such interest with lot No.

7 the purchasers would acquire present easement privileges in connection with that lot. That Ford intended to convey to his grantees an easement in the alley and was paid therefor does not, it seems to me, admit of doubt. Otherwise his language is meaningless. His declared intention is "to convey to the parties of the second part hereto all the rights, privileges and immunities" contained in the original alleyway agreement, "except as hereinbefore reserved." At the same time he reserves to himself the right of using the alley in the same manner as theretofore. Of course, his attempt to extend this easement to a lot to which it was not originally appurtenant was futile. His grant cannot be given the full effect intended.

[9, 10] But this is no reason why it should be denied all legal effect. It is perfectly clear that the conveyance of Ford's undivided one-third of the fee of the alley, together with all of his easement rights, if made without any reservation, would have extinguished his easement, although it could pass no easement, as such, to the grantee. The legal effect would have been to pass the servient estate freed from the servitude. Here he makes a reservation to himself, and conveys the easement except as reserved. If the reservation is construed to be to Ford and his heirs, the conveyance of the easement is meaningless and ineffectual, and conferred nothing on the grantees. If it is construed to be to Ford for life, the grantees took the fee in the servient estate partly freed from the servitude, and the grant of the easement was effectual and beneficial to that extent. The grant must be construed most strongly against the grantor.

[11] There are other considerations which support this view. The reservation is without words of inheritance. I do not regard this omission as material, except on the question of intent, for it is well settled that an exception need not contain words of inheritance in order to retain the excepted interest to the grantor and his heirs, and that words of reservation may create an exception according to the nature of the thing reserved and the intent of the parties. Claflin v. Boston, etc., R. Co., 157 Mass. 489, 32 N. E. 659, 20 L. R. A. 638; Wood v. Boyd, 145 Mass. 176, 13 N. E. 476; White v. New York, etc., R. Co., 156 Mass. 181, 30 N. E. 612. The absence of words of inheritance, however, are here of significance. Ford intended to convey everything but what he reserved. Had he also reserved the right to his heirs and assigns, there would have been nothing left of the rights under the alleyway agreement to convey.

It is to be noted, further, that in the agreement converting lot No. 5 into an alley the parties covenanted for themselves, their heirs and assigns, that each would pay an equal proportion of the cost of maintaining the alley and of the taxes chargeable thereon. This obligation the parties and their successors continued to meet up to the time of Ford's conveyance. Thereafter neither Ford nor any subsequent owner of lot No. 3 ever paid any part of the cost of maintenance of the taxes. This omission or failure would not alone have worked a forfeiture of an existing easement appurtenant, but it shows that the obligations as fixed by the alleyway agreement were considered at an end, and lends support to the conclusion that the reservation was merely of an easement in gross. Furthermore, lot No. 3 never had a stable upon it. The alley was used mainly in connection with the stables of the other lot owners, and must have been far less beneficial to Ford than to his neighbors. This may explain why he was willing to convey all his interest in the alley except a personal right for his life.

[12] The deeds to subsequent grantees conveying the one-third of the fee of the alley, wherein the reservations to Ford are described as being to him and his heirs and assigns, do not, in my opinion bind the plaintiffs or create an estoppel against them. These recitals are merely descriptive of Ford's deed, which speaks for itself, and absolutely fixes the rights of these defendants. In 16 Cyc. p. 701, the rule is thus stated: "The doctrine of estoppel does not extend to mere descriptive matter, or statements or recitals which are immaterial and not contractual or essential to the purposes of the instrument. Thus the description in a deed of lands excepted from the conveyance, as having been conveyed to another, does not estop the grantor, nor one to whom he shall convey the excepted lands, from alleging that no such conveyance as recited has been made."

[13] Again, an estoppel by deed can only arise in favor of the parties and privies to that deed. Pope v. O'Hara, 48 N. Y. 446. Of course, these defendants may invoke any estoppel that their predecessor, Ford, could have set up. But Ford was not privy to the deeds upon which the defendants rely. If he had reserved the easement to himself and his heirs, and the subsequent deeds described the reservation as to Ford for his lifetime, certainly no estoppel would thereby have arisen against Ford. The element of mutuality is lacking. These deeds have no bearing on the controversy.

My conclusion, therefore, is, first, that the agreement establishing the alley does not authorize its use in connection with a business building.

[14] This alone would require that any use by the defendants be enjoined while lot No. 3 remains occupied as at present; for, even if any part of the user in connection with that lot is legal, it cannot be separated from the illegal user. McCullough v. Broad Exchange Co., 101 App. Div. 566, 92 N. Y. Supp. 533, affirmed on opinion below 184 N. Y. 592, 77 N. E. 1191.

I conclude, further, however, that lot No. 3 has no present easement in the alley, and that the defendants must be perpetually enjoined from making any use thereof.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and MILLER, JJ.

D. B. Ogden, for appellants.
J. G. Milburn, for respondents.

PER CURIAM. Judgment affirmed, with costs, on opinion of David Leventritt, Referee.

---

### REICHARD v. HUTTON et al.

(Supreme Court, Appellate Division, Third Department.   January 12, 1912.)

1. EXECUTORS AND ADMINISTRATORS (§ 55*)—PROPERTY OF ESTATE—STOCK INDORSED BY DECEASED.

Notwithstanding stock had been indorsed over by intestate to his wife and daughter, absolute title not having passed, because of nondelivery, it technically passed to his administratrix, though its avails be not necessary for payments of debts, and though the wife and daughter may have some equitable title thereto.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. § 55.*]

2. EXECUTORS AND ADMINISTRATORS (§ 427*)—ACTIONS—REPRESENTATIVE CAPACITY.

Where property belonging to an intestate's estate has been interfered with by a third person, though with permission of the administratrix, thus making her liable on an accounting, she may sue for the wrong in her representative capacity.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 1666–1672; Dec. Dig. § 427.*]

3. DISMISSAL AND NONSUIT (§ 72*)—DEFECT CURED BY AMENDMENT OF COMPLAINT.

Nonsuit is not justified on the ground that no conversion took place at the time alleged; the court having properly allowed an amendment of the complaint to conform to the proof as to time of conversion.

[Ed. Note.—For other cases, see Dismissal and Nonsuit, Dec. Dig. § 72.*]